## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| CINEMARK HOLDINGS, INC., *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 4:21-cv-11-ALM |
| | § | |
| FACTORY MUTUAL INSURANCE | § | |
| COMPANY, | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFFS' SECOND AMENDED COMPLAINT AND
## DEMAND FOR JURY TRIAL

Plaintiffs, Cinemark Holdings, Inc.; Cinemark USA, Inc.; CNMK Texas Properties, LLC; Century Theaters, Inc.; Cinemark Partners II, Ltd.; Greeley, Ltd.; and Laredo Theatre, Ltd. (collectively, "Cinemark") bring this action for damages and declaratory relief against Defendant, Factory Mutual Insurance Company ("FM Global").

## I.   **INTRODUCTION**

1.      This action for declaratory judgment, breach of contract, breach of the covenant of good faith and fair dealing, and violations of the Texas Insurance Code arises out of Cinemark's claim for coverage under an "all risks" commercial property insurance policy that FM Global sold to Cinemark.

2.      Despite agreeing to cover Cinemark for all risks of physical loss or damage to covered property from any cause (unless specifically excluded) and Cinemark's resulting business interruption loss, FM Global refuses to stand by the insurance policy that it wrote.  Instead, FM Global orchestrated a claims-handling strategy designed to limit or altogether deny Cinemark the recovery it is entitled to its insurance policy – a policy which Cinemark relies upon to protect it

against unforeseen loss or damage and resulting loss of income.  In that policy, FM Global undeniably agreed to insure against loss and damage caused by **communicable disease**, both at and away from Cinemark's property.  FM Global should be required to cover Cinemark's losses.

## II.   PARTIES

3.   Cinemark Holdings, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business in Plano, Texas.

4.   Cinemark USA, Inc. is a corporation organized under the laws of the State of Texas with its principal place of business in Plano, Texas.

5.   CNMK Texas Properties, LLC is a limited liability company organized under the laws of the State of Texas with its principal place of business in Plano, Texas.

6.   Century Theaters, Inc. is a corporation organized under the laws of the State of California with its principal place of business in Plano, Texas.

7.   Cinemark Partners II, Ltd. is a limited partnership organized under the laws of the State of Texas with its principal place of business in Plano, Texas.

8.   Laredo Theatre, Ltd. is a limited partnership organized under the laws of the State of Texas with its principal place of business in Plano, Texas.

9.   Greeley, Ltd. is a limited partnership organized under the laws of the State of Texas with its principal place of business in Plano, Texas.

10.   FM Global is a corporation organized under the laws of the State of Rhode Island with its principal place of business in Johnston, Rhode Island.  FM Global is, among other things, in the business of insuring companies like Cinemark.  FM Global is a foreign insurance corporation that conducts business within the State of Texas.  FM Global may be served with process by serving its registered agent, CT Corporation System, at 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

**Plaintiffs' Second Amended Complaint and Demand for Jury Trial – Page 2**

### III.   JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this dispute because the amount in controversy exceeds $75,000 exclusive of interest and costs, and complete diversity of citizenship exists.

12.     Venue is proper in this District under 28 U.S.C. § 1391 because Cinemark's principal place of business is in this District, and a substantial portion of the events and omissions giving rise to the claims and losses at issue occurred within the District.

### IV.   FACTUAL BACKGROUND

**A.     Cinemark's Operations and the Policy it Purchased to Protect Them**

13.     Cinemark is a leader in the motion picture exhibition industry, as the third largest movie theater circuit in the U.S., with approximately 332 theatres and 4,522 screens in 42 states, and approximately 200 theatres in 17 countries outside of the U.S.

14.     Cinemark relies on numerous other businesses in its supply chain to operate its theatres, including the production and shipping companies that supply it with cinematic content, the food and beverage companies that supply its concession and food areas, and others.

15.     FM Global is an insurance company that sold an "all risks" insurance policy, which provides coverage to Cinemark for "ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as . . . excluded . . . ." *See* Policy No. 1051832, attached as Ex. A (the "Policy").

16.     The Policy has an effective term of April 30, 2019 to April 30, 2020.

17.     Cinemark's insured locations, referred to as "insured **locations**" and "**location**" throughout the Policy, are "as specified in the Schedule of Locations" or "if not so specified in the Schedule of Locations: a building, yard, dock, wharf, pier or bulkhead (or any group of the

foregoing)."[1] Ex. A at COMPLAINT_000084-85.   These locations are referred to here as "Cinemark Locations."

18.     The Policy contains two independent triggers of coverage; the Policy insures against "physical loss" of property and, separately, against "damage" to property.

19.     As used in the Policy, the term "physical loss" is separate, distinct, and has an independent meaning from the term "damage."

20.     The Policy does not define the term "physical."

21.     The Policy does not define the term "physical loss."

22.     The Policy does not define the term "damage."

23.     The Policy does not define the phrase "physical loss or damage."

24.     When undefined, the phrase "physical loss or damage" is susceptible to more than one reasonable interpretation.

25.     When the undefined phrase "physical loss or damage" is susceptible to more than one reasonable interpretation, it should be interpreted against the drafter.

26.     Dictionary definitions of "loss" include:

a.      "Deprivation." Loss, Merriam-Webster, https://www.merriamwebster.com/dictionary/loss

b.      "[D]ecrease in amount, magnitude, or degree." Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss

c.      "The fact that you no longer have something or have less of something." Loss, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/loss?q=Loss

---

[1] Terms appearing in bold font are defined terms in the Policy and are as they appear in the Policy.

   d.  "Having less than before." Loss, Macmillan Dictionary,

https://www.macmillandictionary.com/us/dictionary/american/loss

   e.  "[T]he state of no longer having something or as much of something."

Loss, Oxford Advanced Learner's Dictionary,

https://www.oxfordlearnersdictionaries.com/us/definition/english/loss?q=loss

  27.  At minimum, Cinemark suffered "deprivation," "decrease," or "having less" of its

covered property due to this Coronavirus pandemic.

  28.  Nothing in the Policy specifies or suggests structural damage or structural alteration

to a Cinemark Location as a prerequisite or condition to coverage.

  29.  In fact, the term "structural" appears nowhere in the Policy.

  30.  Rather, the Policy includes multiple coverages that clearly do not require structural

damage or structural alteration of insured property, such as the Policy's Personal Property

Coverage (Ex. A at COMPLAINT_000020), the Policy's Cyber Additional Coverages (*Id.* at

COMPLAINT_000028), the Policy's Fine Arts and Valuable Papers and Records Coverage (*Id.* at

COMPLAINT_000036).

  31.  The Policy likewise covers myriad types of loss or damage to Real Property that do

not require structural damage or structural alteration to property, such as broken windows,

damaged roofs, and other types of direct physical loss to insured property that do not compromise

the structural integrity of the insured premises.

  32.  The Policy also affords coverage to Cinemark for Time Element (i.e., business

interruption) losses resulting from physical loss or damage of the type insured under the Policy.

*Id.* at COMPLAINT_000048.

33.     The policy does not require that physical loss or damage be permanent; nor does it require any permanent dispossession.  In fact, the policy expressly contemplates as a condition to coverage that physical loss or damage and resulting business interruption <u>will</u> <u>not</u> be permanent and that there be <u>no</u> permanent dispossession.

34.     Specifically, business interruption coverage only is available for such time as "with due diligence and dispatch . . . [t]he lost or damaged property could be repaired or replaced and made ready for . . . business operations . . . ." (Ex. A at COMPLAINT_000070)

35.     Therefore, not only does the policy expressly limit coverage for physical loss or damage and resulting business interruption to a finite and temporary period of time, the policy requires as a condition to coverage that the insured end the period of liability as soon as reasonably possible.

36.     **Communicable disease**, as defined in the Policy, is a covered cause of loss.

37.     Physical loss or damage caused by **communicable disease**, therefore, is "physical loss or damage of the type insured" under the Policy.

38.     Physical loss or damage caused by **communicable disease** necessarily includes physical loss or damage caused by virus, disease causing or illness causing agents.

39.     The Policy provides up to $500 million in coverage for property damage and business interruption losses, inclusive, per occurrence.  *Id.* at COMPLAINT_000010.

40.     In exchange for FM Global's agreement to take on Cinemark's risk of loss, Cinemark paid FM Global $3,785,253 in premium.

**B.**     **COVID-19 is a Deadly Communicable Disease That Causes Physical Loss and Damage to Property**

41.     COVID-19 is a deadly **communicable disease** that has already infected over 29 million people in the U.S. and caused more than 536,000 deaths.[2]

42.     The World Health Organization (the "WHO") declared the COVID-19 outbreak a pandemic, and former President Trump declared a nationwide emergency due to the COVID-19 outbreak in the U.S.

43.     A pandemic, by definition, is "an epidemic occurring worldwide . . . ."[3] (The omnipresence of COVID-19 as a pandemic is referred to here as the "Pandemic.").

44.     As a declared Pandemic, COVID-19 is present globally, including at each Cinemark Location.

45.     Although COVID-19 is "novel," scientists now understand that the virus spreads very easily from person to person through three primary modes of transmission.[4]

46.     First, COVID-19 spreads via airborne transmission when an uninfected person inhales droplets of the saliva or nasal discharge of an infected person.[5]

---

[2] CDC, *Cases in the U.S.* (https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html) (last visited Mar. 19, 2021).

[3] Heath Kelly*, The classical definition of a pandemic is not elusive*, 89 Bulletin of the WHO 7, at 540-41 (2011) (https://www.who.int/bulletin/volumes/89/7/11-088815/en/#:~:text=A%20pandemic%20is%20defined%20as) (last visited Mar. 19, 2021).

[4] Neeltje van Doremalen, *et al.*, *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, N. ENG. J. MED. (Apr. 16, 2020) (https://www.nejm.org/doi/full/10.1056/NEJMc2004973) (last visited Mar. 19, 2021).

[5] CDC, *How COVID-19 Spreads* (last updated Oct. 28, 2020) (https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html) (last accessed Nov. 18, 2020); CDC, *Scientific Brief: SARS-CoV-2 and Potential Airborne Transmission* (last updated Oct. 5, 2020), (https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-sars-cov-2.html) (last visited Mar. 19, 2021).

47.     Clouds of droplets of saliva or nasal discharge of an infected person, which may be released by a cough, a sneeze, or loud speech, can linger in the air for minutes or hours, and can affect persons, personal and real property, and indoor air within real property.[6]

48.     Second, these smaller droplets, known as aerosols, can linger in the air for hours, as confirmed by a July 2020 study published by the Centers for Disease Control ("CDC"),[7] infecting people further away from the infected person and even after the infected person has left the premises. This kind of spread is referred to as aerosol or airborne transmission.[8] Aerosol droplets can be pulled into air circulation systems and spread to other areas in a building.[9]

49.     Aerosol transmission involves the airborne transmission of viral RNA in particles smaller than 50 microns (human hair is about 80 microns), and which do not settle onto surfaces like larger droplets emitted through saliva and nasal discharge.[10]   Aerosol transmission typically

---

[6] Ramon Padilla & Javiar Zarracina, *Coronavirus might spread much farther than 6 feet in the air.  CDC says wear a mask in public,* USA Today (last updated Sep. 21, 2020) (www.usatoday.com/in-depth/news/2020/04/03/coronavirusprotection-how-masks-might-stop-spread-throughcoughs/5086553002/) (last visited Mar. 19, 2021).

[7] Jianyun Lu & Zhicong Yang, *COVID-19 outbreak associated with air conditioning in restaurant, Guangzhou, China, 2020,* 26 Emerging Infectious Diseases 11 (Sep. 11, 2020) (https://wwwnc.cdc.gov/eid/article/26/11/20-3774_article#suggestedcitation) (last visited Mar. 19, 2021) ("We conclude that the air conditioner prompted transmission of SARS-CoV-2; the customers in the airflow were at high risk for infection with SARS-CoV-2 in the poorly ventilated environment. Because the staff and other diners were not exposed to the airflow mixed with SARS-CoV-2 transmitted by patient A1, their risk for infection was lower.").

[8] Padilla, *et al.*, *supra*, at n.5.

[9] *Id.*

[10] Jose-Luis Jimenez, *COVID-19 Is Transmitted Through Aerosols. We Have Enough Evidence, Now It Is Time to Act, Time* (Aug. 25, 2020) (https://time.com/5883081/covid-19-transmitted-aerosols/) (last visited Feb. 4, 2021); Pien Huang, Researchers Say Fresh Air Can Prevent Aerosol Transmission Of The Coronavirus, NPR (Sep. 7, 2020) (https://www.npr.org/2020/09/07/910499236/researchers-say-fresh-air-can-prevent-aerosol-transmission-ofthe-coronavirus) (last visited Mar. 19, 2021).

involves viral RNA emitted through exhaled breath like larger droplets emitted through saliva and nasal discharge.[11]

50.    Indeed, medical researchers recommend the use of HEPA and other specialized air filtration systems can be used to remediate the presence of airborne SARS-CoV-2 in buildings.[12] In other words, physical alteration of property may be necessary to render it safe from COVID-19 and return the property to a safe and useable state.

51.    Third, respiratory droplets can also land on surfaces and objects. Surfaces, once physically affected by COVID-19, are referred to as fomites.[13] A person can get COVID-19 by touching a surface or object that has the virus on it and then touching his or her own mouth, nose, or eyes.[14]

---

[11] Ramon Padilla & Javiar Zarracina, *Coronavirus might spread much farther than 6 feet in the air, supra* ("'You cannot separate out droplet and fine aerosol emissions in everyday activities like talking, breathing and laughing.' Many scientists believe droplets and aerosols are on a continuum of sizes. 'So if they accept that droplet transmission is happening they cannot exclude any contribution from aerosols.'"); Wenzhao Chen, *et al.*, *Short-range airborne route dominates exposure of respiratory infection during close contact*, BUILDING & ENV'T 176 (June 2020) (https://www.sciencedirect.com/science/article/abs/pii/S0360132320302183) (last visited Mar. 19, 2021) (Abstract) ("The short-range airborne route is found to dominate at most distances studied during both talking and coughing.").

[12] Zeynep Tufeckci, *We Need to Talk About Ventilation*, The Atlantic (July 30, 2020) (https://www.theatlantic.com/health/archive/2020/07/why-arent-we-talking-more-aboutairborne-transmission/614737/) (last visited Mar. 19, 2021).

[13] Stephanie A. Boone and Charles P. Gerba, *Significance of Fomites in the Spread of Respiratory and Enteric Viral Disease*, American Society for Microbiology (Mar. 13, 2007) (https://aem.asm.org/content/73/6/1687) (last visited Mar. 19, 2021).

[14] *Id*.

52.     *The New England Journal of Medicine* study's results suggest that individuals could become infected with COVID-19 through indirect contact with surfaces or objects used by an infected person, whether they were symptomatic or not.[15]

53.     In a "Situation Report" released by the WHO, it is reported that the virus can be transmitted through symptomatic transmission, pre-symptomatic transmission, or asymptomatic transmission.[16]

54.     Infected persons "shed" the virus (*i.e.*, pose a risk of viral transmission) before, during, and after their illness.[17] In fact, scientists have reason to believe that infected people are the most contagious *before* they experience symptoms, during what is called the "incubation" or "pre-symptomatic" period.[18]

---

[15] National Institutes of Health, *New coronavirus stable for hours on surfaces* (Mar. 17, 2020) (https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces) (last visited Mar. 19, 2021); Neeltje van Doremalen, *et al.*, *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, New England Journal of Medicine (2020) (https://www.nejm.org/doi/full/10.1056/nejmc2004973) (last visited Mar. 19, 2021).

[16] WHO, Coronavirus disease 2019 (COVID-19) Situation Report – 73, *supra*.

[17] CDC, How COVID-19 Spreads, *supra*.

[18] Seungjae Lee, MD, et al., Clinical Course and Molecular Viral Shedding Among Asymptomatic and Symptomatic Patients With SARS-CoV-2 Infection, JAMA (Aug. 6, 2020) (https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2769235) (study revealing that viral loads were similar between the symptomatic and asymptomatic groups and actually decreased more slowly among the asymptomatic carriers, meaning that they had higher loads for longer) (last visited Mar. 19, 2021); Lirong Zou, M.Sc., et al., SARS-CoV-2 Viral Load in Upper Respiratory Specimens of Infected Patients, 382 NEW ENG. J. MED. 1177 (Mar. 19, 2020) (https://www.nejm.org/doi/full/10.1056/nejmc2001737) ("The viral load that was detected in the asymptomatic patient was similar to that in the symptomatic patients, which suggests the transmission potential of asymptomatic or minimally symptomatic patients.") (last visited Mar. 19, 2021); Monica Ghandi, et al., Asymptomatic Transmission, the Achilles' Heel of Current Strategies to Control Covid-19, 382 NEW ENG. J. MED. 2158 (Apr. 24, 2020) (https://www.nejm.org/doi/full/10.1056/nejme2009758) ("Ultimately, the rapid spread of Covid-19 across the United States and the globe, the clear evidence of SARS-CoV-2 transmission from asymptomatic persons, and the eventual need to relax current social distancing practices argue

**Plaintiffs' Second Amended Complaint and Demand for Jury Trial – Page 10**

55.    In other words, a person may be the most contagious when they feel healthy enough to go about their normal business, increasing the risk of transmission.

56.    In addition, the CDC has estimated that approximately 40% of COVID-19 positive individuals never develop symptoms.[19] This gives the CDC reason to speculate that infection rates for COVID-19 likely are at least ten times higher than reported.[20]

57.    The incubation period for COVID-19, which is the time between exposure and the onset of symptoms, can be up to fourteen (14) days.[21]

58.    During the incubation period, or "pre-symptomatic" period, infected persons can be contagious, and disease transmission can occur before the infected person shows any symptoms or has any reason to believe he or she has become infected.[22]

---

for broadened SARS-CoV-2 testing to include asymptomatic persons in prioritized settings.") (last visited Mar. 19, 2021).

[19] Ellen Cranley, *40% of people infected with COVID-19 are asymptomatic*, BUSINESS INSIDER (July 12, 2020) (https://www.businessinsider.com/cdc-estimate-40-percent-infected-with-covid-19-asymptomatic-2020-7) (last visited Mar. 19, 2021).

[20] Erika Edwards, *CDC says COVID-19 cases in U.S. may be 10 times higher than reported*, NBC News (June 25, 2020) (https://www.nbcnews.com/health/health-news/cdc-says-covid-19-cases-u-s-may-be-10-n1232134) (last visited Mar. 19, 2021).

[21] WHO, *Coronavirus disease 2019 (COVID-19) Situation Report – 73* (Apr. 2, 2020) (https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2) (last visited Mar. 19, 2021).

[22] *Id*. ("In a small number of case reports and studies, pre-symptomatic transmission has been documented through contact tracing efforts and enhanced investigation of clusters of confirmed cases.  This is supported by data suggesting that some people can test positive for COVID-19 from 1-3 days before they develop symptoms.").

59.     Pre-symptomatic persons carry the greatest viral-load (i.e., the quantity of virus in an individual's system) among all infected persons,[23] meaning their ability to transmit COVID-19 is greater than symptomatic persons.[24]

60.     During and after illness, viruses are shed in large numbers in body secretions, including blood, feces, urine, saliva, and nasal fluid.[25]

61.     Further, the WHO has confirmed that the virus can live on objects or surfaces.

62.     Contamination of frequently touched surfaces is, therefore, a potential source of viral transmission.[26]

63.     Fomites consist of both porous and nonporous surfaces or objects that can become infected with a virus and serve as vehicles of transmission.[27]

---

[23] Xi He, *et al.*, *Temporal dynamics in viral shedding and transmissibility of COVID-19*, 26 NATURE MED. 672, 674 (Apr. 15, 2020) (https://www.nature.com/articles/s41591-020-0869-5) ("A total of 414 throat swabs were collected from these 94 patients, from symptom onset up to 32 days after onset. We detected high viral loads soon after symptom onset, which then gradually decreased towards the detection limit at about day 21. . . . Our analysis suggests that viral shedding may begin 5 to 6 days before the appearance of the first symptoms. After symptom onset, viral loads decreased monotonically, consistent with two recent studies.") (last visited Mar. 19, 2021).

[24] Lirong Zou, M.Sc., *et al.*, *SARS-CoV-2 Viral Load in Upper Respiratory Specimens of Infected Patients*, N. ENG. J. MED. (Mar. 19, 2020) (https://www.nejm.org/doi/full/10.1056/nejmc2001737) ("The viral load that was detected in the asymptomatic patient was similar to that in the symptomatic patients, which suggests the transmission potential of asymptomatic or minimally symptomatic patients.") (last visited Mar. 19, 2021); Roman Wolfel, *et al.*, *Virological assessment of hospitalized patients with COVID-2019*, 581 NATURE 465 (Apr. 1, 2020) (https://pubmed.ncbi.nlm.nih.gov/32235945/) (last visited Mar. 19, 2021).

[25] Ellen Cranley, 40% of people infected with COVID-19 are asymptomatic, *supra*.

[26] National Institutes of Health, New coronavirus stable for hours on surfaces, *supra*.

[27] *Id.*

**Plaintiffs' Second Amended Complaint and Demand for Jury Trial – Page 12**

64.     Fomites become infected with virus by direct physical contact with body secretions or fluids, contact with soiled hands, contact with aerosolized virus (large droplet spread) released while talking, sneezing, coughing, or vomiting, or contact with airborne virus that settles after disturbance of an infected fomite (*e.g.*, opening theatre curtains ).[28]

65.     Once a fomite is infected, the transfer of infectious virus may readily occur between inanimate and animate objects, or vice versa, and between two separate fomites.[29]

66.     *The New England Journal of Medicine* has reported that COVID-19 was detectable in aerosols for up to three hours, up to four hours on copper, up to twenty-four hours on cardboard, and up to three days on plastic and stainless steel.[30]

67.     The CDC has reported that the virus can remain on polystyrene plastic, aluminum, and glass for eight days at the humidity recommended for indoor living spaces.[31]

68.     Another scientific study documented in the *Journal of Hospital Infection* found that COVID-19 can remain infectious on inanimate surfaces at room temperature for up to nine days.[32]

69.     All of these materials are used by Cinemark throughout its facilities and operations.

---

[28] *Id*.

[29] *Id*.

[30] *See* sources, *supra*, at n.23.

[31] Boris Pastorino, *et al*., *Prolonged Infectivity of SARS-CoV-2 in Fomites*, 26 Emerging Infectious Diseases 9 (Sep. 2020) (https://wwwnc.cdc.gov/eid/article/26/9/20-1788_article) (last visited Mar. 19, 2021).

[32] G. Kampf, *et al.*, *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents*, 104 J. OF HOSP. INFECTION 246-51 (Jan. 31, 2020) (https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3) (last visited Mar. 19, 2021).

**Plaintiffs' Second Amended Complaint and Demand for Jury Trial – Page 13**

70.     A study by the *Virology Journal* showed that stable COVID-19 can survive on surfaces up to 28 days, serving as a vehicle for viral transmission during that time span.[33]

71.     Because COVID-19 is a pandemic and is statistically certain to be carried by a number of individuals who visit Cinemark Locations daily, COVID-19 is continually reintroduced to the air and surfaces of Cinemark Locations.

72.     The presence of COVID-19 on property, including real and personal property at Cinemark Locations, causes a tangible alteration to that property. It changes the property, including air and the surfaces into dangerous transmission mechanisms for the disease, rendering the affected property unsafe, unfit and uninhabitable for ordinary functional use.

73.     Under normal operating conditions, there is no effective way to repair or remediate the physical loss or damage caused by COVID-19 to commercial properties like the Cinemark Locations, because continued use of that property results in continual reintroduction of COVID-19 to the property.

74.     Short of complete closure of the Cinemark Locations, implementation of strict administrative and operational controls that, among other things, limit the number of persons at a Location are the only effective ways to repair or remediate the physical loss or damage caused by COVID-19 and protect against further loss or damage from COVID-19.

75.     Mere cleaning and disinfecting of the property and the indoor air does not repair or remediate the actual physical and tangible alteration to property caused by COVID-19, nor does it transform the property from its unsafe, hazardous and potentially deadly condition.

---

[33] Shane Riddell, *et al.*, *The effect of temperature on persistence of SARS-CoV-2 on common surfaces*, 17 VIROLOGY J. 145 (Oct. 7, 2020) (https://doi.org/10.1186/s12985-020-01418-7) (last visited Mar. 19, 2021).

**Plaintiffs' Second Amended Complaint and Demand for Jury Trial – Page 14**

76.     This is particularly the case with property accessible to the public, where removal of COVID-19 from the property does not repair or remediate the physical damage and tangible alteration to property due to the continuous reintroduction of COVID-19 to the property.

77.     Cinemark was obligated to continue to operate its business to the best of its reasonable ability in order to mitigate its business income loss. In doing so, Cinemark incorporated both administrative and engineering controls to aid in mitigation of the physical loss or damage caused by COVID-19. These controls include but are not limited to reduction in building capacity, the installation of temporary barriers, use of increased efficiency HVAC filters, and the creation and installation of plastic dividers throughout Cinemark Locations. Cinemark regularly supplements these controls and others to add additional mitigation protocols and to follow current regulations and guidance issued by the CDC.

78.     Even under the foregoing and other controls, Cinemark's Locations continue to sustain physical loss and damage caused by COVID-19.

79.     The presence of COVID-19 on property, including on and within Cinemark Locations, caused and continues to cause physical loss and/or damage to Cinemark's property by causing, among other things, a distinct, demonstrable, physical change and/or tangible alteration to property, causing Cinemark Locations to remain in an unsafe, hazardous and potentially deadly condition.

80.     The presence of COVID-19 also caused and continues to cause physical loss and/or damage by transforming the physical condition of the property at Cinemark Locations, rendering the property hazardous and unsafe to human health for occupancy, thereby depriving Cinemark of the functionality and reliability of its property in a manner consistent with its intended purpose.

81.     This physical loss and/or damage to property, including Cinemark Locations, has required Cinemark to close Cinemark Locations, incur extra expense, adopt remedial and precautionary measures to restore and remediate the air and surfaces at its Cinemark Locations, and limit or cease operations across all of its Cinemark Locations.

82.     Beginning in or around March 2020, COVID-19 caused a distinct, demonstrable, physical change and/or tangible alteration to Cinemark Locations and property that Cinemark depends upon to conduct its normal business operations.

83.     However, given the absence of commercially-available tests for surface and aerosol presence of COVID-19 and the shortage of testing kits for humans, positive test results are not and cannot be the only means of proving the presence of COVID-19.

84.     In addition, numerous Cinemark employees exhibited signs or actual symptoms of COVID-19, or tested positive for COVID-19, throughout the period of June to November 2020 and were or had been present in Cinemark Locations.  During this period, Cinemark employees recorded a combined total of more than 5,562 sick days.  During that period, almost 500 employees had COVID-19 symptoms, were exposed to COVID-19, or tested positive for COVID-19.

85.     Symptomatic employees were required to take a minimum of 10 days off work. From June to November 2020, at least 270 employees were symptomatic.

86.     Employees exposed to COVID-19 were required to take a minimum of 14 days off work.  From June to November 2020, at least 158 employees were exposed to COVID-19.

87.     Employees who tested positive for COVID-19 were required to take a minimum of 10 days off work.  From June to November 2020, at least 65 employees tested positive for COVID-19.

88.     From June to November 2020, at least 14 employees who were exposed to COVID-19 or tested positive for COVID-19 were exposed to COVID-19 at a Cinemark Location.

89.     Additionally, during the period of March 17, 2020 to November 3, 2020, Cinemark Locations had 3,690,952 registered guests from all over the world.

90.     In addition to having actual presence of COVID-19 at Cinemark Locations due the actual presence of persons infected with COVID-19, Cinemark sustained a distinct, demonstrable, physical change and/or tangible alteration to its property based on the statistically certain presence of COVID-19.

91.     Statistical modeling confirms, beyond any reasonable doubt and to a high degree of statistical certainty, that COVID-19 was and continues to be present at Cinemark Locations.[34]

92.     Positivity rates, which are material to statistical modeling, measure saturation of COVID-19 in a particular locale.  Among other things, positivity rates are used to determine the statistical likelihood that at least one COVID-19 positive person will enter a facility.  Positivity rates are an indicator of the ubiquitous presence of COVID-19.[35]

93.     The WHO recommends that a particular area reach a positivity rate of 5.00% or lower before reopening.[36]

---

[34] *See also, COVID-19 Event Risk Assessment Planning Tool*, Georgia Institute of Technology (https://covid19risk.biosci.gatech.edu/) (last visited Mar. 19, 2021).

[35] David Dowdy & Gypsyamber D'Souza, *COVID-19 Testing: Understanding the "Percent Positive"*, Johns Hopkins Bloomberg School of Public Health (Aug. 10, 2020) (https://www.jhsph.edu/covid-19/articles/covid-19-testing-understanding-the-percent-positive.html) (last visited Mar. 19, 2021).

[36] *See* Johns Hopkins University & Medicine, *WHICH U.S. STATES MEET WHO RECOMMENDED TESTING CRITERIA?*, (https://coronavirus.jhu.edu/testing/testing-positivity) (last visited Mar. 19, 2021).

**Plaintiffs' Second Amended Complaint and Demand for Jury Trial – Page 17**

94.     As of this filing, Johns Hopkins University calculates 32 states to have a positivity rate that is above 5.00%.[37]

95.     In September 2020, a new strain of the coronavirus that causes COVID-19 was reported in the United Kingdom.[38]   By December 2020, the new strain was responsible for approximately 60% of new COVID-19 cases in that region.  To date, the new strain of coronavirus has appeared in 33 countries, including the United States.[39]

## C.     The Insurance Industry and FM Global Specifically Knew of the Risks and Dangers of the Pandemic

96.     Insurers, such as FM Global, were repeatedly warned, and have been aware for years, of the potential impact of pandemics. In fact, there were many publicly available reports about the risk of pandemics – and what insurers should do – in the months and years before the Coronavirus pandemic. For example:

   a.   One article noted in March 2018: "Even with today's technology, a modern severe pandemic would cause substantive direct financial losses to the insurance community. In addition, indirect losses would be severe, most notably on the asset side of the balance sheet."[40]

   b.   The Insurance Library Association of Boston (founded 1887) lists on its website at least 15 articles, reports, and white papers available to insurers from early

---

[37] *Id.*

[38] Robert Bollinger, M.D., M.P.H. and Stuart Ray, M.D., *A New Strain of Coronavirus: What You Should Know*, Johns Hopkins Medicine (Dec. 28, 2020) (https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/a-new-strain-of-coronavirus-what-you-should-know) (last visited Mar. 19, 2021).

[39] Grace Hauck, *More contagious COVID-19 strain identified in 3 states and 33 countries: What to know*, USA Today (last updated Jan. 15, 2021) (https://www.usatoday.com/story/news/health/2021/01/02/new-covid-strain-b-117-explained/4112125001/) (last visited Feb. 4, 2021).

[40] *See* "What the 1918 Flu Pandemic Can Teach Today's Insurers," *AIR* (Mar. 29, 2018) (https://www.air-worldwide.com/publications/air-currents/2018/What-the-1918-Flu-Pandemic-Can-Teach-Today-s-Insurers/) (last visited Mar. 19, 2021).

2007 through 2018.[41] The Association states on its website: "The past 20 years has seenthe rise of a number of pandemics. Slate recently published an article on what has been learned about treating them in that time. We thought it might be apt for us to take a look back and see what the insurance industry has learned as well." The webpage then lists various articles and reports discussing the risks and impacts of pandemics on the insurance industry. For example, an article stated in 2014 that pandemics "can have a significant impact on life and health insurance portfolios, and, depending on contract terms, could also affect other lines such as workers' compensation, business interruption, travel and event cancellation and disability insurance."[42]

97.     Moreover, over the course of decades, courts have held that the presence of a hazardous substance at or on a property, including the airspace inside buildings, constitutes property damage.  Many courts have also held that the closure of property due to imminent risk of physical loss or damage or danger to inhabitants constitutes physical loss of property. Upon information and belief, insurers, including FM Global, have been and continue to be aware ofthese court decisions.

98.     FM Global itself previously argued in court filings that mold infestation in theclean room of a laboratory caused physical loss or damage—despite not causing a structural alteration of the property—and was therefore covered. *See Factory Mut. Ins. Co. v. Federal Ins. Co.*, No. 1:17-cv-00760 (D.N.M. Nov. 11, 2019), ECF No. 127 (attached hereto as Ex. L). In support, FM Global asserted that "numerous courts have concluded that loss of functionality or reliability under similar circumstances constitutes physical loss or damage," and cited case law as referenced in paragraph 105 above. FM Global also argued that another insurer's failure to define "physical loss

---

[41] *See* https://insurancelibrary.org/2020/02/07/pandemics-and-insurance/ (last visited Mar. 11, 2021).

[42] *See* Nita Madhav, "Travel Sickness: Pandemic Risk Models Show Diseases Move More Quickly and with Greater Impact in our Connected World," *Best's Review*, 115 no. 8 (Dec. 1, 2014).

or damage" made that term "susceptible of more than onereasonable interpretation," rendered the policy "ambiguous," and "must be construed against" thatinsurer.

**D.      Governmental Orders Because of COVID-19 and Related Physical Loss and/or Damage to Property**

99.      As a consequence of physical loss and/or damage caused by COVID-19, federal, state and local governments imposed unprecedented directives through governmental orders (the "Governmental Orders") prohibiting travel to and within the United States, requiring certain businesses to close, and requiring residents to remain in their homes unless performing "essential" activities.  Excerpts from representative Governmental Orders are attached as Ex. B.

100.      Separate and apart from the loss and damage COVID-19 has caused and continues to cause to property, including Cinemark Locations, the Governmental Orders have limited, restricted, or prohibited partial or total access to Cinemark Locations by, among other things, (a) requiring businesses deemed "non-essential" to close; (b) requiring businesses, after reopening, to make tangible alterations to their property and operations; and (c) requiring businesses, after reopening, to restrict customers from patronizing those businesses.

101.      Cinemark Locations were damaged by stringent requirements of the Government Orders to the same extent they were damaged from COVID-19 and the Pandemic as the Locations were unusable.

102.      Among other things, the Government Orders affected Cinemark in several ways.

103.      First, the Government Orders caused physical loss to property, including Cinemark Locations, by depriving Cinemark of physical possession of insured property.

104.      Second, and independently, the Government Orders affected Cinemark as a consequence of their issuance as a direct result of physical damage to property caused by the

presence of COVID-19 and the Pandemic, including the distinct, demonstrable, physical change and/or tangible alteration to property caused by COVID-19. *See supra*, ¶¶ 51-53.

105.    The distinct, demonstrable, physical change and/or tangible alteration to property that directly caused the issuance of the Governmental Orders includes, among other things, the ability of COVID-19 to attach to surfaces for prolonged periods, remain viable in indoor air, and render property unsafe for normal use, *see supra*, ¶¶ 42-64, and the loss of functionality and/or reliability of property caused by COVID-19 when it transforms air and property into a dangerous and potentially deadly instrumentality.

106.    Numerous Governmental Orders remain in effect and continue to require the suspension of business operations for non-essential businesses.

107.    As a business that relies on materials and customers from next door, to across the country and around the world, Cinemark is subject to and has been adversely affected by these various Governmental Orders.

108.    The Governmental Orders, the damage caused by COVID-19, and the transmission of COVID-19 have had a devastating effect on Cinemark's business.

109.    As a result of COVID-19, the Pandemic, and the Governmental Orders, Cinemark was required to implement the use of personal protective equipment (PPE) and other administrative and operational controls at Cinemark Locations.   These controls entail, among other things, physical alterations to insured property to repair and remediate the damage caused by COVID-19 and mitigate further damage, resulting in a limitation on business operations at Cinemark Locations.

110.    Cinemark also has been forced to operate under the strict implementation of administrative and operational controls that limit the number of persons at the property in order protect against further loss or damage from COVID-19.

111.    The Governmental Orders have caused and are continuing to prohibit or hinder access to Cinemark's property.

112.    The Governmental Orders continue to deny Cinemark the safe, functional and reliable insured use of its property.

113.    Even when Cinemark was permitted to operate, its business volume and practices were significantly impacted by the loss of and damage to its property. Indeed, Cinemark lost the full range of rights and advantages of using or accessing its business property. For example, Cinemark has had to limit the number of customers at its property, purchase more sanitization products, reduce operational hours, institute "no contact" procedures, provide PPE to employees and customers and implement other operational and physical controls in order to safeguard against the hazards caused by COVID-19.

114.    Persons infected with COVID-19 were present at Cinemark Locations prior to the closures of Cinemark Locations beginning on or around March 13, 2020.

115.    Even with the reopening and loosening of restrictions in certain jurisdictions, Cinemark's operations have not yet returned to pre-loss levels.

116.    In some jurisdictions, new Governmental Orders restricting or closing businesses have been issued as a result of a resurgence in COVID-19 cases after reopening for only a short period of time.  Some states have begun to re-implement tighter restrictions and have required businesses to close again after uncontrollable spread of COVID-19 and surges of COVID-19 cases and deaths.

**E.      The "All Risks" Coverage Is Triggered in Multiple Ways**

117.     The "All Risks" coverage that FM Global sold to Cinemark "covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy." Ex. A at COMPLAINT_000001.

118.     FM Global drafted the Policy.

119.     **Communicable disease** is a cause of physical loss or damage covered under the Policy.

120.     The Policy also covers loss resulting from the imminent *risk* of physical loss or damage caused by **communicable disease**. Ex. A at COMPLAINT_000001.

121.     Pursuant to the Policy's various coverage provisions, physical loss and damage caused by, and/or the actual not suspected presence of, **communicable disease**, trigger coverage under the Policy up to the Policy's $500,000,000 limit of liability.

1.      **The Policy Expressly Evidences FM Global's Intent and Expectation that Communicable Disease Causes Loss or Damage to Property**

122.     Pursuant to the "Communicable Disease Response" coverage, the Policy expressly covers, among other things, "the reasonable and necessary costs incurred … for the: 1) cleanup, removal and disposal of … **communicable disease** from insured property." *Id.* at COMPLAINT_000033.

123.     The Policy defines **communicable disease**, in relevant part, as a disease which is "transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges[.]" *Id.* at COMPLAINT_000081.

124.     The Policy does not exclude loss, cost or damage caused by **communicable disease**.

**Plaintiffs' Second Amended Complaint and Demand for Jury Trial – Page 23**

125.    The Policy does not exclude loss, cost or damage caused by a virus that causes **communicable disease**.

126.    COVID-19 is a disease that is transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges.  *Ibid.* Therefore, COVID-19 is a **communicable disease** under the Policy.

127.    By providing for the "cleanup, removal and disposal of … **communicable disease**," the Policy explicitly recognizes that **communicable disease** physically damages property.  *Id.* at COMPLAINT_000033.

128.    By excepting from its coverage for **communicable disease** "loss or damage directly or indirectly caused by . . . **terrorism,** the Policy expressly recognizes that **communicable disease** causes physical loss or damage.  *Id.* at COMPLAINT_000034.

129.    The Policy's explicit recognition that **communicable disease** causes "loss or damage" is confirmed by FM Global's regulatory submissions concerning related policy forms and FM Global's addition of **communicable disease** as a covered peril.

130.    On information and belief, prior to its inclusion in the Advantage – TE Select coverage form, FM Global and/or its parent and/or sister companies represented to state regulators and the public that the **communicable disease** overage specifically applied to physical damage caused by **communicable disease**.

131.    In another commercial property insurance policy form utilized by FM Global, the FMG7446 form, FM Global stated specifically with respect to the "Communicable Disease" coverage extension, that "the presence of and the spread of communicable diseases will be considered direct physical damage and the expenses listed above will be considered expenses to

repair such damage."  A true copy of excerpts from FM Global's regulatory filing regarding the FMG7446 form is attached as Ex. C.

132.    On information and belief, the **communicable disease** coverage used in, among other forms, the FMG7446 form, forms the basis for the Communicable Disease coverages included in the Policy.

133.    As evidenced by FM Global's representations to state insurance regulators, the **communicable disease** coverage provided in the Policy was added as an enhancement from, and no less restrictive than, the coverage contained in the FMG7446 form.

134.    The Policy also provides coverage for "Interruption By Communicable Disease."

135.    Like the Communicable Disease Response coverage, the Interruption by Communicable Disease coverage expressly recognizes that **communicable disease** causes "loss or damage" to property, by specifically and clearly excepting from its coverage for **communicable disease** "loss or damage directly or indirectly caused by . . . **terrorism**."  *Id.* at COMPLAINT_000068.

136.    Accordingly, as evidenced by the Policy's specific response to physical loss or damage caused by the insured peril of **communicable disease**, physical damage to property caused by **communicable disease** is "physical loss or damage of the type insured" under the Policy.

**2.    <u>COVID-19 Has Caused Damage to Cinemark's Property, Triggering Coverage Under the "All Risks" Policy</u>**

137.    The actual presence of COVID-19 at Cinemark Locations has triggered coverage under the Policy.

138.    COVID-19 (the communicable disease) and SARS-CoV-2 (its causative agent) have been consistently present (and regularly reintroduced) by asymptomatic and pre-symptomatic guests, patrons and employees since the beginning of this pandemic and through the current date.

139.    Pre-symptomatic and asymptomatic customers and employees infected with COVID-19 have been at Cinemark Locations frequently, regularly, and consistently over the course of this pandemic. These individuals go undetected by even the most robust COVID-19 screening, control and mitigation protocols that Cinemark utilizes.

140.    While on-site, individuals infected with COVID-19 shed SARS-CoV-2 (the causative agent of the COVID-19) into the indoor air and onto surfaces throughout the property.

141.    As a result of this shedding, infectious SARS-CoV-2 particles remain suspended in the indoor air and present on surfaces (both of which are INSURED PROPERTY under the Policy) at Cinemark Locations.

142.    Due to the high-volume and high turnover rate of customers at Cinemark Locations, the high prevalence of infection rate among customers, and the ongoing presence of pre-symptomatic and asymptomatic infected individuals (customers and employees), COVID-19 and SARS-CoV-2 is consistently present at, and constantly being reintroduced to, the properties.

143.    As a result, COVID-19 and infectious SARS-CoV-2 particles have been omnipresent at Cinemark Locations throughout the course of this pandemic, and their complete elimination from the indoor air and surfaces at Cinemark Locations is physically impossible – that is, until the entire population is inoculated and/or herd immunity is achieved.

144.    COVID-19 is transmitted by, among other means, inhalation of these airborne infectious SARS-CoV-2 particles or contact with surfaces where they reside.

145.    Of the approximate 8,300 domestic employees at Cinemark, to date 1,781 have tested positive for COVID-19, and the vast majority of those individuals were on Cinemark property in close proximity in time to their positive test result meaning they were on-site with COVID-19 and shedding SARS-CoV-2 to indoor air and surfaces throughout the property.

**Plaintiffs' Second Amended Complaint and Demand for Jury Trial – Page 26**

146.    While customers are obviously more difficult to monitor for COVID-19, based on scientific modeling using reliable methodologies reliably applied, to a very high degree of certainty, many more individuals with COVID-19 entered Cinemark Locations during the period of January 1, 2020 to present.[43]

147.    The presence of COVID-19 in the air and on surfaces causes physical loss and/or damage to the property by causing a physical alteration of the air and surfaces from a safe and functional condition to a dangerous and potentially lethal non-functional condition.

148.    The COVID-19 pandemic and the presence of COVID-19 on surfaces or in the air at a theater property renders the property unfit and unusable for normal occupancy, and uninhabitable and/or unfit for its intended purpose as a movie theater.

149.    The actual presence of COVID-19 and SARS-CoV-2 cause physical loss and damage to the property at Cinemark Locations and/or other properties in a number of ways, including:

   a. introduction of COVID-19 and SARS-CoV-2 to indoor air at Cinemark Locations directly and physically changes, alters, and transforms the composition of the air—such that now it contains a concentration of SARS-CoV-2 infectious particles (whereas before it did not).

   b. presence of COVID-19 and SARS-CoV-2 at Cinemark Locations transforms the indoor air on the property into a veritable petri dish for COVID-19 and a dangerous transmission mechanism for the communicable disease rendering the property (absent extraordinary and extremely robust administrative and engineering controls that significantly interfere and impede with operations) uninhabitable, unsafe, unfit for occupancy, and/or totally inaccessible. That is the exact same impact that ammonia, asbestos fibers, toxic fumes, pervasive odors and/or wildfire smoke have on air—all

---

[43] Updated calculations will be provided to FM Global at regular intervals until COVID-19/SARS-CoV-2 is eradicated from Cinemark Locations, the associated physical loss and damage is completely repaired, and the need to mitigate against additional physical loss and damage has abated.

**Plaintiffs' Second Amended Complaint and Demand for Jury Trial – Page 27**

of which have been determined to cause physical loss or damage to property.

    c.  presence of COVID-19 and SARS-CoV-2 at Cinemark Locations also transforms the surfaces at the property in the exact same manner as set forth above in subparagraph (b) rendering the property (absent extraordinary and extremely robust administrative and engineering controls that significantly interfere and impede with operations) uninhabitable, unsafe, unfit for occupancy, and/or totally inaccessible.

150.    Consistent with the physical loss and damage experienced by Cinemark at its Locations, experts have already opined in other similar matters as to the precise mechanism by which such damage occurs.

151.    In litigation pending in Nevada federal court against FM Global's sister-company, Affiliated FM Insurance Company, styled *Treasure Island LLC v. Affiliated FM Ins. Co*., No. 2:30-cv-00965-JC-EJY (D. Nev.), the insured's virology expert, Dr. Angela Rasmussen, opined as follows in her November 6, 2020 initial report (see Ex. M attached hereto):

    a.  "COVID-19 is a communicable disease that impacts and physically damages Treasure Island's property in the following way: persons on site with COVID-19 shed the SARS-CoV-2 virus into the air and surfaces at Treasure Island. This results in tangible, demonstrable, and detectable physical alternation and transformation to the air and surfaces rendering them dangerous transmission vehicles for the potentially deadly disease."

    b.  "The impact and physical damage caused by persons with COVID-19 is not temporary and is sustained through any occupation of the property. Because COVID-19 is an infectious viral disease that can be transmitted to susceptible people, it causes additive, sustained property damage. A substantial amount of transmission is prior to onset of clinical symptoms, which makes it difficult to detect. Due to the size of the property at Treasure Island, cleaning and disinfection alone are insufficient to remediate the damage."

152.    In the same litigation, the insured's epidemiology expert, Dr. Alex LeBeau, opined in his November 6, 2020 initial report (see Ex. N attached hereto) as follows: "Individuals with COVID-19 at Treasure island altered the physical characteristics of surfaces and the air of occupied spaces at the location and at facilities in the vicinity with respiratory secretions and aerosols. As

a result, the surfaces and air of occupied spaces at Treasure Island became vehicles for COVID-19 transmission."

153.    In addition, the presence of COVID-19 on property away from Cinemark Locations has triggered coverage under the Policy.

154.    COVID-19 has caused and continues to cause physical loss and damage in the specific manner described above, including Cinemark's property.

155.    Cinemark has experienced and continues to experience physical loss and damage of the type insured under the Policy to its property as a result of COVID-19.

156.    COVID-19 also has caused and continues to cause Cinemark to experience covered business interruption.

157.    As a result of the actual presence of COVID-19 and SARS-CoV-2 at Cinemark Locations and elsewhere, and the associated physical loss and damage that is ongoing, Cinemark has experienced crippling business interruption losses (among other damages), which are ongoing as efforts to repair, correct and mitigate the impact of COVID-19/SARS-CoV-2 is underway.

158.    Cinemark has submitted a claim pursuant to the Policy as a result of sustaining losses covered by the Policy.  Notwithstanding, FM Global denied, or effectively denied, coverage for Cinemark's claim and did so in bad faith based on an apparent systematic company practice designed to minimize payments for covered COVID-19 claims.

3.    **Multiple "Additional Coverages" Are Triggered under the "All Risks" Policy**

159.    In addition to triggering the Policy's "all risks" coverage, Cinemark's claim also triggers multiple coverage extensions provided under the Policy, including, but not limited to, the following:

a.    *COVID-19 Triggered the Policy's Communicable Disease Response Coverage*

**Plaintiffs' Second Amended Complaint and Demand for Jury Trial – Page 29**

160.  The actual presence of COVID-19 at the Cinemark Locations has caused physical damage to property at these Cinemark Locations resulting in the issuance of an order by an authorized governmental agency regulating **communicable disease**, thereby triggering coverage under the Policy's Communicable Disease Response coverage.

161.  The actual presence of COVID-19 continues to exist at Cinemark Locations.

  b.  *COVID-19 Triggered the Policy's Claims Preparation Costs Coverage*

162.  The Policy covers Claim Preparation Costs, which it defines as the actual costs incurred by Cinemark for producing and certifying any particulars or details contained in its books or documents, or such other proofs, information or evidence required by FM Global resulting from insured loss payable under this Policy for which FM Global has accepted liability.

163.  Cinemark has incurred actual costs to respond to FM's requests for additional information regarding Cinemark's claim, thereby triggering the Policy's Claims Preparation Costs coverage.

  c.  *COVID-19 Triggered the Policy's Protection and Preservation of Property*

164.  COVID-19 also has caused and continues to cause actual physical loss and damage to insured property. In addition, COVID-19 has threatened and continues to threaten to cause physical loss and damage to property.

165.  This actual and threatened physical loss and damage to insured property has prompted Cinemark to take action to temporarily protect or preserve its property, thereby triggering the Policy's Protection and Preservation of Property coverage.

  d.  *COVID-19 Triggered the Policy's Time Element Loss Coverage*

166.    The Policy affords coverage for Cinemark's Time Element losses, subject to the Policy's terms and conditions.

167.    COVID-19 has caused Cinemark to suffer Time Element loss as a result of physical loss and damage of the type insured under the Policy.

168.    This loss triggers coverage under the Policy's Time Element Loss provisions including, without limitation, coverage for Gross Earnings and Extended Period of Liability, or Gross Profit, at Cinemark's option.

### e.    *COVID-19 Triggered the Contingent Time Element Extended Coverage*

169.    The actual presence of COVID-19 at **contingent time element locations** has caused physical damage to property at those **contingent time element locations** resulting in actual loss and extra expense to Cinemark, thereby triggering coverage under the Policy's Contingent Time Element Extended coverage.

170.    Upon information and belief, the actual presence of COVID-19 continues to exist at **contingent time element locations**.

### f.    *COVID-19 Triggered the Policy's Extra Expense*

171.    COVID-19 has caused Cinemark to incur reasonable and necessary expenses to continue as close to normal as possible the conduct of Cinemark's business.  Such expenses are beyond those that Cinemark would have normally incurred in conducting its business absent the presence of COVID-19.

172.    The expenses incurred by Cinemark beyond those necessary in the normal operation of its business, solely as a result of the physical loss and damage caused by COVID-19, trigger coverage under the Policy's Extra Expense coverage.

### g.    *COVID-19 Triggered the Policy's Civil or Military Authority*

173.    The physical damage caused by the presence of COVID-19 at property located within five (5) statute miles of Cinemark Locations has directly resulted in the issuance of the Governmental Orders prohibiting access to Cinemark Locations.

174.    Cinemark has sustained and will continue to sustain business interruption losses because orders from civil authorities, issued as a direct result of physical damage of the type insured at a Cinemark Location or within five (5) statute miles of such a Cinemark Location, have prohibited access to Cinemark Locations.

175.    These Governmental Orders were issued as a direct result of physical damage to property from COVID-19, which is damage of the type insured, at a Cinemark Location and/or within five (5) statute miles of a Cinemark Location.

### h.    *COVID-19 Triggered the Policy's Ingress/Egress*

176.    COVID-19 and the physical loss and damage it has caused have resulted in the necessary interruption of Cinemark's business by totally or partially preventing ingress to or egress to and from Cinemark Locations as a direct result of physical loss and damage of the type insured to property of the type insured, thereby triggering the Policy's Ingress/Egress coverage.   For example:

  a.  El Paso, Texas: The shopping mall in which Cinemark Location No. 367 closed down, and reopened under limited capacity, due to COVID-19.[44]  As a result of the closure, ingress and egress from the Cinemark Location was partially or totally prevented.

---

[44] Veronica Martinez, *Some El Paso malls prepare to open Friday as stay home orders to curb COVID-19 spread expire*, El Paso Times (Apr. 30, 2020) (https://www.elpasotimes.com/story/news/2020/04/30/coronavirus-stay-home-order-ending-el-paso-malls-plans-reopen/3040345001/) (last visited Feb. 4, 2021).

**Plaintiffs' Second Amended Complaint and Demand for Jury Trial – Page 32**

b. Los Angeles, California: The shopping mall in which Cinemark Location No. 1084 is located has been closed since March due to COVID-19.[45] As a result of the closure, ingress and egress from the Cinemark Location was partially or totally prevented.

c. West Dundee, Illinois: The shopping mall in which Cinemark Location No. 1139 is located was closed due to COVID-19.[46] As a result of the closure, ingress and egress from the Cinemark Location was partially or totally prevented.

d. Monroeville, Pennsylvania: The shopping mall in which Cinemark Locations No. 1065 is located was closed in March 2020 due to COVID-19.[47] As a result of the closure, ingress and egress from the Cinemark Location was partially or totally prevented.

### i. *COVID-19 Triggered the Policy's Logistics Extra Cost*

177. COVID-19 caused Cinemark to incur extra cost due to the disruption of the **normal** movement of goods or materials directly between insured Cinemark Locations or directly between a Cinemark Location and a **location** of a direct customer, supplier, contract manufacturer or

---

[45] Roger Vincent, *Baldwin Hills Crenshaw Plaza shopping mall to be sold to New York developers*, LA Times (Oct. 6, 2020) (https://www.latimes.com/business/story/2020-10-06/baldwin-hills-crenshaw-plaza-shopping-mall-to-be-sold-to-new-york-developers) (last visited Feb. 4, 2021).

[46] Lauren Zumback, *Many Illinois stores are reopening Friday as phase 3 begins. Here's the latest on where you can shop and what to expect.*, Chicago Tribune (May 29, 2020) (https://www.chicagotribune.com/coronavirus/ct-coronavirus-illinois-stores-reopening-20200528-upvwab6cuvgh5gcrefoqfimloy-story.html) (last visited Feb. 4, 2021).

[47] Megan Tomasic, *Westmoreland, Monroeville malls closed per Wolf's order*, Trib Live (Mar. 20, 2020) (https://triblive.com/local/westmoreland/westmoreland-monroeville-malls-close-due-to-coronavirus-fears/) (last visited Feb. 4, 2021).

contract service provider to Cinemark, thereby triggering the Policy's Logistics Extra Cost coverage.

178.    For example, many of the films scheduled for release in 2020 and early 2021 have not and will not be released in Cinemark theaters due to COVID-19, including, but not limited to:

a.    *Black Widow*, the highly-anticipated Marvel Studios' thriller, now is expected to be released May 7, 2021.[48]

b.    Steven Spielberg's adaptation of *West Side Story* has been pushed to December 10, 2021.[49]

c.    *The King's Man* release date was postponed from September 18, 2020, to February 12, 2021.[50]

d.    *Soul*, a Pixar Animation film, will no longer be released in theaters in November, instead, the film will debut exclusively on Disney+, an on-demand streaming service.[51]

---

[48]*Movies delayed (again) by COVID-19*, USA Today (Nov. 5, 2020) (https://www.usatoday.com/picture-gallery/entertainment/movies/2020/03/24/movies-postponed-by-coronavirus-crisis-mulan-matrix-batman-wonder-woman/111460070/) (last visited Feb. 4, 2021).

[49] *Id.*

[50] *Id.*

[51]Sarah Whitten, *Pixar's 'Soul' ditches theaters, is heading to Disney+ for Christmas*, CNBC (Oc. 8, 2020) (https://www.cnbc.com/2020/10/08/pixars-soul-ditches-theaters-is-heading-to-disney-for-christmas.html) (last visited Feb. 4, 2021).

**Plaintiffs' Second Amended Complaint and Demand for Jury Trial – Page 34**

### j.    *COVID-19 Triggered the Policy's Attraction Property*

179.    COVID-19 also caused and is continuing to cause physical loss and damage to property away from Cinemark Locations, including property located within one (1) statute mile of Cinemark Locations, thereby triggering the Policy's Attraction Property coverage.  For example:

    a.  Grapevine, Texas: Dallas Fort Worth Airport is within one mile of Cinemark Location No. 206, where five TSA agents tested positive for COVID-19, as of April 14, 2020.[52]

    b.  Boca Raton, Florida: Florida Atlantic University ("FAU") is less than one mile from Cinemark Location No. 1048, and tallied 41 FAU students and one FAU employee as having tested positive for COVID-19 as of September 9, 2020.[53]

    c.  Los Angeles, California: Loyola Marymount University ("LMU") is located less than one mile of Cinemark Location No. 1014, where three LMU community members were confirmed to have tested positive for COVID-19 as of March 12, 2020.[54]

---

[52] Kyle Arnold, *Two More TSA Screeners at DFW Airport Test Positive for COVID-19*, AviationPros (Apr. 14, 2020) (citing The Dallas Morning News) (https://www.aviationpros.com/aviation-security/news/21133812/two-more-tsa-screeners-at-dfw-airport-test-positive-for-covid19) (last visited Feb. 4, 2021).

[53] Zachary Weinberger, *FAU reports 42 positive COVID-19 cases in new system that updates every 30 minutes*, University Press (Sept. 9, 2020) (https://www.upressonline.com/2020/09/fau-reports-42-positive-covid-19-cases-in-new-system-that-updates-every-30-minutes/) (last visited Feb. 4, 2021).

[54] *Coronavirus (COVID-19) | Update*, LMU Community Messages (Mar. 12, 2020), (https://www.lmu.edu/together/communitymessages/coronaviruscovid-19update/#:~:text=There%20are%20currently%20no%20confirmed,and%20are%20following%20their%20guidance) (last visited Feb. 4, 2021).

    d.   Melrose Park, Illinois: The Gottlieb Memorial Hospital, where patients are treated for COVID-19, is located less than one mile from Cinemark Location No. 221.

    e.   Pittsburgh, Pennsylvania: Grocery stores within one mile of Cinemark Locations Nos. 1034 and 1084 reported employees tested positive for COVID-19 as of March 28, 2020.[55]

### 4.    No Exclusion Impacts Coverage

180.   No exclusion in the Policy applies to preclude or limit coverage for the actual presence of COVID-19 at or away from Cinemark Locations, the physical loss and damage to property at Cinemark Locations, and/or the business interruption losses that have and will continue to result from the physical loss and damage to property. To the extent FM Global contends any exclusions apply, such exclusions are unenforceable.

### 5.    The Policy's Contamination Exclusion Does Not Apply

181.   The Policy's Communicable Disease Response coverage provides coverage for, among other things, "the reasonable and necessary costs incurred . . . for the: 1) cleanup, removal and disposal of . . . **communicable disease** from insured property." Ex. A at COMPLAINT_000033-34.

182.   COVID-19 is a **communicable disease** transmissible from human to human. *Id.* at COMPLAINT_000081.

---

[55] Andrew Limberg, *Two More Cases Of Coronavirus Reported At Two Local Giant Eagle Location*, NewsRadio 1020 KDKA (Apr. 1, 2020) (https://www.radio.com/kdkaradio/articles/two-more-cases-of-coronavirus-reported-at-giant-eagle-stores) (last visited Feb. 4, 2021).

183.    COVID-19 therefore meets the definition of **communicable disease** under the Policy.

184.    The term "disease" is not defined in the Policy.  The term, therefore, must be afforded its plain and ordinary meaning.

185.    "Disease" is defined in ordinary usage as "a condition . . . typically manifested by distinguishing signs and symptoms."  *See* https://www.merriam-webster.com/dictionary/disease.

186.    By definition, therefore, a "disease" is intangible.

187.    Because "disease" is intangible, the Policy's coverage for the "cleanup, removal and disposal" of **communicable disease** necessarily pertains to the disease's causative agent.

188.    The Policy contains an exclusion that purports to preclude coverage for **contamination**. *Id.* at COMPLAINT_000025.

189.    The Policy defines **contamination** as, among other things, a "virus." *Id.* at COMPLAINT_000081.

190.    The Policy's Contamination exclusion does not mention **communicable disease.** While FM Global included within the "contamination" definition the terms "pathogen," "pathogenic organism," "virus," and "disease causing or illness causing agent," FM Global did not use those terms in its definition of "communicable disease." Based upon information and belief Cinemark alleges that FM Global thus did not intend to include **communicable disease** as an excluded **contaminant** under the Policy.

191.    The Policy's Contamination exclusion therefore does not exclude coverage for loss caused by **communicable disease**.

192.    The Policy's Contamination exclusion does not exclude coverage for loss caused by COVID-19.

193.    The Policy's Contamination exclusion contains an exception for "radioactive contamination."

194.    The Policy's Contamination exclusion does not contain an exception for coverage for **communicable disease**.

195.    The Policy cannot simultaneously provide coverage for **communicable disease**, yet purport to simultaneously exclude SARS-CoV-2 or COVID-19.

196.    Conflicting provisions within the Policy cannot be read to negate certain coverages or in ways that render some coverage provisions mere surplusage. In Texas, the words of the Policy must be read in a manner that gives meaning to all language, and leaves no provision without force and effect. Otherwise, the coverage would be illusory and the provisions, when read together, would make no sense. Consistent with these rules of construction and interpretation, the Contamination exclusion obviously and evidently does not apply to SARS-CoV-2 or COVID-19.

197.    Furthermore, the Contamination exclusion excludes only contamination and associated "direct""costs," not "loss" or "damage," or even indirect "costs," such as time element loss and extra expenses.

198.    Contamination exclusions like the one FM Global drafted here apply to traditional pollution, not to natural catastrophes such as pandemic. To the extent COVID-19/SARS-CoV-2 is actually present or suspected of being present at a Cinemark Location, its presence would be the result of a natural process, as opposed to an act of pollution or contamination.  Cinemark reasonably expected and understood that a Contamination exclusion would apply to polluting activities, as opposed to natural catastrophes such as the Coronavirus pandemic.

199.    The Policy's Contamination exclusion does not exclude coverage for Cinemark's claim.

200.    To the extent FM Global contends that the Policy's Contamination exclusion bars coverage for loss caused by **communicable disease** or some other aspect of Cinemark's claim, the Policy is, at worst for Cinemark, ambiguous, and therefore, must be construed in favor of coverage. *Dallas Nat. Ins. Co. v. Sabic Americas, Inc*., 355 S.W.3d 111, 122 (Tex. App. – Houston  [1st Dist.] 2011, pet. denied) (finding pollution exclusion ambiguous and acknowledging that the court must adopt the construction of the policy urged by the insured "as long as [the insured's] construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent").

### 6.    The Policy's Communicable Disease Sublimit Does Not Cap Cinemark's Losses

201.    The Policy affords coverage to Cinemark for the actual presence of **communicable disease** at a Cinemark Location.  This **communicable disease** coverage is found under two sections of the Policy titled "Communicable Disease Response" and "Interruption by Communicable Disease" (together, the "On-Site Communicable Disease Coverages").

202.    The Communicable Disease Response provision expressly provides that it is an "Additional Coverage."

203.    The Interruption by Communicable Disease Response provision expressly provides that it is a coverage "Extension."

204.    The On-Site Communicable Disease Coverages were added to the Policy as "enhancements" to what the base policy form already covered as **communicable disease**. *See* Ex. D at COMPLAINT_000209.

205.    **Communicable disease** is a risk of physical loss or damage not excluded under the Policy.

206.    Physical loss or damage caused by **communicable disease** is physical loss or damage of the type insured under the Policy.

207.    The Policy contains no provision or wording that designates the On-Site Communicable Disease Coverages as the exclusive coverages applicable to physical loss or damage caused by **communicable disease.**

208.    The On-Site Communicable Disease Coverages do not operate to limit any other coverage under the Policy that may also apply to loss or damage resulting from or caused by **communicable disease**, including physical loss or damage resulting from or caused by **communicable disease** at or away from Cinemark Locations.

209.    Likewise, any sublimit applicable to the On-Site Communicable Disease Coverages does not apply to limit any other coverage under the Policy that may also apply to loss or damage resulting from or caused by **communicable disease**, including physical loss or damage resulting from or caused by **communicable disease** at or away from Cinemark Locations.

210.    The Policy's On-Site Communicable Disease Coverages are not limited by, and are not an "exception to" the Policy's Contamination exclusion. Rather, that the Policy affords explicit coverage for loss and damage caused by **communicable disease**, while also excluding coverage for **contamination**, which is defined to include, among other things, "virus," clearly demonstrates the insurer's intent that the Policy's Contamination exclusion have no application to loss or damage caused by **communicable disease** or its causative agent.

211.    Rather, coverage for physical loss and damage, and/or resulting business interruption loss, from or caused by **communicable disease**, including physical loss or damage resulting from or caused by **communicable disease** at or away from Cinemark Locations, is subject to the Policy limits associated with the coverage or coverages implicated.

212.    To the extent FM Global contends that the Policy's Contamination exclusion bars coverage for loss caused by **communicable disease**, or some other aspect of Cinemark's claim, the Policy is, at worst for Cinemark, ambiguous, and therefore, must be resolved in favor of the insured. *Mid-Continent Cas. Co. v. Petroleum Sols., Inc.*, 917 F.3d 352, 358 (5th Cir. 2019) ("'A basic rule of contract construction is that the preferred interpretation is one that provides meaning to every provision and does not read any term out of the contract.' This is particularly important in the insurance context where, if there is ambiguity, the construction favoring coverage must be adopted.").

213.    In addition, the insurance industry has known the risks associated with pandemics for more than a century. These risks have been even more pronounced and evident to FM Global in recent decades due to SARS, Ebola, MERS, H1N1, and Zika.

214.    Because such risks are well-known to both FM Global and insurers generally, there are exclusions in common usage in the insurance industry that could have unambiguously excluded losses caused by communicable diseases, viruses, and pandemics, without also covering such risks in the policies.

215.    However, FM Global, a sophisticated insurer, decided not to include any such exclusions in the Policy it sold to Plaintiffs. To the contrary, the Policy contains two express grants of coverage for **communicable disease**, such that losses from **communicable disease** are affirmatively covered and are of the type insured under the Policy.

216.    Because the Policy affirmatively grants coverage for **communicable disease**, neither affirmative coverage grant can reasonably be understood to be an exception to any exclusion.

217.    At a minimum, the Contamination exclusion is ambiguous as applied to claims, like Plaintiffs', arising from the presence of COVID-19/SARS-CoV-2. Under settled principles of insurance law, such ambiguous exclusions must be construed in favor of coverage for Plaintiffs and against FM Global.

218.    FM Global cannot meet its heavy burden to prove that the Contamination exclusion clearly and unmistakably applies to Plaintiffs' claim and is not subject to any other reasonable interpretation.

### 7.    The Policy's Loss of Market or Loss of Use Exclusion Does Not Apply

219.    The Policy affords coverage for certain economic loss resulting from covered physical loss or damage.

220.    The Policy also affords coverage for certain economic loss sustained after covered physical loss or damage has been repaired or remediated and the property has been made ready for operations.

221.    The Policy also contains an exclusion that purports to preclude or limit coverage for "loss of market or loss of use."

222.    The Policy's "loss of market or loss of use" exclusion does not apply to any economic loss sustained a result of covered physical loss or damage.

223.    The Policy's "loss of market or loss of use" exclusion does not apply to any economic loss sustained after covered physical loss or damage has been repaired or remediated and the property has been made ready for operations.

224.    The Policy's "loss of market or loss of use" exclusion applies, if at all, only where a claim has been made for economic loss that *does not* result from physical loss or damage covered under the Policy.

225. Alternatively, the Policy's "loss of market or loss of use" exclusion is ambiguous.

F. **FM Global's Bad Faith Conduct**

1. **FM Global Conducted an Inadequate and Improper Investigation of Cinemark's Claim**

226. Aware that its Policy broadly affords coverage for physical loss or damage caused by **communicable disease** beyond the On-Site Communicable Disease Coverages, FM Global devised a plan designed to steer its policyholders, including Cinemark, into at most, the sublimited On-Site Communicable Disease Coverages for their COVID-19 losses.

227. FM Global executed that plan in response to Cinemark's claim.

228. By e-mail dated April 20, 2020, and in further discussion by phone on April 27, 2020, Cinemark notified FM Global that Cinemark had shut down its business operations worldwide due to COVID-19. Ex. E at COMPLAINT_000210.

229. By letter dated May 18, 2020, FM Global reserved its right to limit or deny coverage to Cinemark. Ex. F at COMPLAINT_000213-216.

230. In communications with FM Global, Cinemark explained that its claim was based on the physical loss and/or physical damage to property caused by, among other things, the presence of COVID-19 at Cinemark Locations and elsewhere, as well as related Governmental Orders prohibiting access to Cinemark Locations and mandating that Cinemark close its doors.

231. FM Global ignored Cinemark's statements and, instead, focused on whether any employees of Cinemark or other persons at Cinemark Locations had tested positive for COVID-19.

232. FM Global failed to further investigate Cinemark's claimed losses.

233. FM Global's May 18, 2020 letter, purported to recap the April 27th conversation. Id. at COMPLAINT_000213.

234.    The May 18 letter notes that the Policy contains the On-Site Communicable Disease Coverages, and that "COVID-19 meets the definition of a communicable disease under the policy." *Id.* at COMPLAINT_000214.  The letter also states that "[o]ther key conditions of this coverage are the actual not suspected presence of a communicable disease at a location owned, leased or rented by Cinemark Holdings, Inc., access to which has been limited, restricted or prohibited for more than 48 hours." *Ibid.*

235.    However, the May 18 letter does not acknowledge that any coverage applies to Cinemark's losses.  Instead, FM Global requested information that Cinemark had already provided and further stated, "[o]nce we have had an opportunity to complete our investigation and review of your policy information, we will confirm any applicable coverages, loss payables, and deductibles in effect." *Id.* at COMPLAINT_000216.

236.    On July 27, 2020, Cinemark provided a written response to requests for claim information. *See* Ex. H at COMPLAINT_000219-224.  In its July 27 letter, Cinemark stated, that it "is investigating and tracking its losses with due diligence, despite substantial reductions in its workforce necessitated by those losses. In view of the continuing nature of its claim and decreased workforce capacity, Cinemark requests an extension to provide FM Global a sworn proof of loss. Cinemark suggests extending the deadline to 90 days after FM Global has completed its investigation."

237.    FM Global never responded to Cinemark's July 27, 2020 letter.

238.    The parties held a phone call on December 23, 2020 to further discuss Cinemark's claim.

239.    FM Global subsequently provided a letter dated January 4, 2021 stating only that, based on its call with Cinemark, FM Global would establish a single claim file for all of

Cinemark's locations to "streamline communication and adjustment of these COVID-19 related losses." Ex. I at COMPLAINT_000225-226.

240.    To date, Cinemark has not received any written response from FM Global to Cinemark's July 27, 2020 letter and request for an extension to provide FM Global with a proof of loss.

241.    On January 21, 2021, Cinemark, by and through its counsel of record, provided a letter to the FM Global adjuster stating, among other things, that Cinemark had filed this lawsuit. Ex. J at COMPLAINT_000227-228.

242.    Cinemark has not received any response from FM Global regarding the January 21, 2021 letter.

243.    On January 27, 2021, FM Global did, however, provide Cinemark a notice of nonrenewal of the Policy, stating that "it is apparent that our respective organizations view the operation of certain material policy provisions quite differently.  Under the circumstances, given this lack of alignment, a future insurance relationship likely would not be mutually satisfactory." In the context of Cinemark's claims and this action including, among other things, FM Global's acknowledgment that COVID-19 is a **communicable disease** covered under the Policy, FM Global's statements in its notice of nonrenewal were knowingly false and made with malice or willful intent to injure Cinemark.  Ex. K at COMPLAINT_000229-230.

### 2.    FM Global's Attempt to Steer Cinemark into the Policy's On-Site Sublimited Communicable Disease Coverages

244.    Based on information and belief, FM Global's delay in providing a written coverage position and its request for voluminous information Cinemark had already provided are not by accident, but rather, they are part of a systematic claims-handling practice and procedure that FM Global has deployed across all COVID-19 claims.

245.   FM Global's systematic practice is outlined in a set of "Talking Points" (the "FM Talking Points"), a true copy of which is attached as Ex. F, which were prepared for FM Global claim adjusters to use to ensure that they reach the same conclusion for all COVID-19 claims.

246.   The FM Talking Points explicitly acknowledge that FM Global "ha[s] a wide range of clients who may be affected in a variety of ways" by COVID-19.   Ex. G at COMPLAINT_000217.

247.   The FM Talking Points outline only a few of the many different coverages contained in FM Global's standard commercial property policies, including policies of the type FM Global sold to Cinemark, that specifically afford coverage for COVID-19 claims. *Id.* at COMPLAINT_000217-218.

248.   The FM Talking Points outline certain specific "triggers" of coverage that the adjuster should look for when investigating any COVID-19 claim.  *Id.* at COMPLAINT_000217.

249.   But the FM Talking Points fail to include all of the different "triggers" of coverage that may be implicated by COVID-19 claims.

250.   Among those "triggers" included by FM Global in its Talking Points is an employee of the insured that "actually has the communicable disease." *Id.* at COMPLAINT_000218.

251.   The FM Talking Points also recognize that some insureds may be unable to disclose that an employee actually has COVID-19 due to medical privacy restrictions.

252.   By including only the On-site Communicable Disease Coverages as coverages potentially applicable to a COVID-19 claim, the FM Talking Points steer adjusters to only seek information that pertains to the On-Site Communicable Disease Coverages.

253.    In fact, the FM Talking Points expressly and unequivocally foreclose the availability of coverage under the Policy's Civil or Military Authority coverage provision, where the FM Talking Points state:

> Q.  Does coverage under Civil or Military Authority apply?
>
> A.  No

Ex. G at COMPLAINT_000218; Ex. A at COMPLAINT_000061.

254.    On information and belief, FM Global had no factual basis for the foregoing statement concerning Civil Authority coverage at the time it prepared that statement for use in the Talking Points.

255.    The FM Talking Points make similar statements with respect to the Policy's Contingent Time Element Extended coverage. Ex. G at COMPLAINT_000218; Ex. A at COMPLAINT_000062.

256.    On information and belief, FM Global likewise lacked factual basis for its statement concerning Contingent Time Element Extended coverage and other coverages addressed in the Talking Points.

257.    The FM Talking Points further instruct that "the presence of a **communicable disease** does not constitute physical damage and is not of the type insured against as a virus falls within the definition of **contamination,** which is excluded." Ex. G at COMPLAINT_000218.

258.    But as alleged above, the Policy FM Global sold to Cinemark expressly recognizes that the presence of **communicable disease** causes physical damage to property because, among other things, it provides coverage for the resulting "cleanup, removal and disposal of … **communicable disease**." Ex. A at COMPLAINT_000033.

259.    Regardless, FM Global failed to conduct any meaningful investigation with respect to Cinemark's claim to determine whether Cinemark had in fact sustained physical loss or damage as a result of **communicable disease**.

260.    The FM Talking Points direct the claims adjuster to reach conclusions without considering the specific facts of a particular claim or the applicable law that governs interpretation of the relevant insurance policy.

261.    Instead, the FM Talking Points coach the adjuster to suggestively steer the policyholder toward the On-Site Communicable Disease Coverages, which provide only a fraction of the coverage limits otherwise available under the Policy.

262.    The FM Talking Points are contrary to the accepted practices of good faith insurance claim handling.

263.    FM Global's practice and procedure constitutes an unfair or deceptive act or practice in the business of insurance.

264.    FM Global's use of the FM Talking Points reflects a conscious disregard of the policyholder's rights under the Policy.

265.    To date, FM Global has not provided Cinemark with any written coverage decision.

266.    FM Global continues to refuse to pay Cinemark's claim and, therefore, has effectively denied its claim.

267.    FM Global knowingly or recklessly failed to conduct a reasonable investigation of Cinemark's claim and, therefore, the basis for FM Global's denial is unreasonable.

268.    In denying Cinemark's claim, FM Global knew its denial lacked any reasonable basis.

269.    In denying Cinemark's claim, FM Global failed to faithfully apply its own Policy language, failed to conduct a reasonable investigation, and failed to consider the facts relevant to Cinemark's claim against the Policy language as interpreted by Texas law.

270.    Because of FM Global's bad faith conduct, including its wrongful denial and inadequate claim investigation, Cinemark has suffered and continues to suffer significant damages.

## COUNT I:  DECLARATORY JUDGMENT

271.    Cinemark repeats and realleges the allegations in the preceding paragraphs.

272.    Cinemark seeks a declaration of the parties' rights and duties under the Policy pursuant to 28 U.S.C. § 2201.  A justiciable controversy exists between Cinemark and FM  Global concerning the availability of coverage under the Policy for Cinemark's claim.

273.    The controversy between Cinemark and FM Global is ripe for judicial review.

274.    Accordingly, Cinemark seeks a declaration from the Court that:

    a.   Each coverage provision identified herein is triggered by Cinemark's claim;

    b.   No exclusion in the Policy applies to bar or limit coverage for Cinemark's claim;

    c.   The Policy covers Cinemark's claim;

    d.   FM Global violated the implied covenant of good faith and fair dealing;

    e.   FM Global violated the Texas Insurance Code; and

    f.   Any other declaratory relief that would be useful to the resolution of the dispute between the parties.

## COUNT II:  BREACH OF CONTRACT (Property Damage)

275.    Cinemark repeats and realleges the allegations in the preceding paragraphs.

276.    The Policy is a valid and enforceable contract between Cinemark and FM.

277.    In the Policy, FM Global agreed to cover property against all risks of physical loss or damage not otherwise excluded.

278.    COVID-19 has caused and is continuing to cause physical loss and/or damage to Cinemark's property.

279.    No exclusions apply to bar coverage.

280.    Cinemark is entitled to coverage for the physical loss and/or damage up to the Policy's $500 million limit of liability or any applicable sublimits.

281.    Cinemark has complied with all applicable Policy provisions, including paying premiums and providing timely notice of its claim.

282.    To the extent Cinemark has not complied with a condition in the Policy, it is because the condition does not apply or FM Global waived it.

283.    Nonetheless, FM Global unjustifiably refuses to pay for Cinemark's physical loss or damage in breach of the Policy.

284.    Cinemark has suffered and continues to suffer damages because of FM Global's breach of the Policy.

285.    Cinemark is entitled to damages because of FM Global's breach of contract in an amount to be determined at trial, including pre- and post-judgment interest and any other costs and relief that this Court deems appropriate.

## COUNT III:  BREACH OF CONTRACT (Time Element)

286.    Cinemark repeats and realleges the allegations in the preceding paragraphs.

287.    The Policy is a valid and enforceable contract between Cinemark and FM Global.

288.    In the Policy, FM Global agreed to cover Time Element loss, as provided in the Time Element Coverages, as a direct result of physical loss or damage of the type insured under the Policy.

289.   COVID-19 has caused and, upon information and belief, is continuing to cause physical loss and/or damage to Cinemark's property and the property of others that has caused Cinemark to suffer Time Element loss.

290.   No exclusions apply to bar coverage.

291.   Cinemark is entitled to coverage for its Time Element loss related to COVID-19 up to the Policy's $500 million limit of liability or any applicable sublimits.

292.   Cinemark has complied with all applicable Policy provisions, including paying premiums and providing timely notice of its claim.

293.   To the extent Cinemark has not complied with a condition in the Policy, it is because the condition does not apply or FM Global waived it.

294.   Nonetheless, FM Global unjustifiably refuses to pay for these losses and expenses in breach of the Policy.

295.   Cinemark has suffered and continues to suffer damages because of FM Global's breach of the Policy.

296.   Cinemark is entitled to damages because of FM Global's breach in an amount to be determined at trial, including pre- and post-judgment interest and any other costs and relief that this Court deems appropriate.

## COUNT IV:  BREACH OF CONTRACT (Time Element Extensions)

297.   Cinemark repeats and realleges the allegations in the preceding paragraphs.

298.   The Policy is a valid and enforceable contract between Cinemark and FM Global.

299.   In the Policy, FM Global agreed to cover Time Element loss, as provided in the Time Element Coverage Extensions, as a direct result of physical loss or damage of the type insured under the Policy.

300.    COVID-19 has caused and, upon information and belief, is continuing to cause physical loss and/or damage to Cinemark's property and the property of others that has caused Cinemark to suffer Time Element loss under the Policy's Time Element Coverage Extensions.

301.    No exclusions apply to bar coverage.

302.    Cinemark is entitled to coverage for its Time Element loss related to COVID-19 up to each Time Element Coverage Extension's limit of liability or any applicable sublimits.

303.    Cinemark has complied with all applicable Policy provisions, including paying premiums and providing timely notice of its claim.

304.    To the extent Cinemark has not complied with a condition in the Policy, it is because the condition does not apply or FM Global waived it.

305.    Nonetheless, FM Global unjustifiably refuses to pay for these losses and expenses in breach of the Policy.

306.    Cinemark has suffered and continues to suffer damages because of FM Global's breach of the Policy.

307.    Cinemark is entitled to damages because of FM Global's breach in an amount to be determined at trial, including pre- and post-judgment interest and any other costs and relief that this Court deems appropriate.

## COUNT V:  BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

308.    Cinemark repeats and realleges the allegations in the preceding paragraphs.

309.    FM Global denied Cinemark's claim for coverage under the Policy relating to its losses from COVID-19.

310.    FM Global has a duty to Cinemark under the Policy's implied covenants of good faith and fair dealing.

311.    FM Global's denial of Cinemark's claim lacks any reasonable basis.

312.    FM Global failed to conduct a reasonable investigation of Cinemark's claim under the Policy and, therefore, FM Global's basis for its denial is unreasonable.

313.    FM Global acted maliciously, intentionally, fraudulently, or with gross negligence in its failure to conduct a reasonable investigation of Cinemark's claim under the Policy.

314.    FM Global employed a systematic "one-size-fits-all" approach to adjusting and denying coverage for all COVID-19 claims, including Cinemark's claim.

315.    FM Global knew or was actually or implicitly aware of the lack of any reasonable basis to deny coverage.

316.    FM Global acted with reckless disregard as to the unreasonableness of its denial.

317.    FM Global breached its duty of good faith and fair dealing by failing to reasonably investigate Cinemark's claim and provide coverage.

318.    FM Global's denial of coverage constitutes bad faith.

319.    As a result of FM Global's bad faith, Cinemark has suffered and is continuing to suffer damages.

320.    Cinemark is entitled to an award of damages because of FM Global's bad faith in an amount to be determined at trial, including attorney's fees, pre- and post-judgment interest and any other costs and relief that this Court deems appropriate.

### COUNT VI:  VIOLATION OF THE TEXAS INSURANCE CODE

321.    Cinemark repeats and realleges the allegations in the preceding paragraphs.

322.    FM Global's wrongful conduct alleged above constitute unfair and deceptive acts and practices in the business of insurance, under Section 541.060 of the Texas Insurance Code ("Section 541.060").

323. FM Global's systemic practice of mischaracterizing the facts provided by policyholders in connection with claims for coverage for losses from COVID-19 constitutes an unfair or deceptive act or practice in the business of insurance pursuant to subdivisions (1), (2), (3), and (7) of Section 541.060.

324. FM Global's systemic practice of attempting to influence and direct policyholders' claims for coverage for losses from COVID-19 to the On-Site Communicable Disease Coverages constitutes an unfair or deceptive act or practice in the business of insurance pursuant to subdivisions (1), (2), and (7) of Section 541.060.

325. FM Global's use of the FM Talking Points with pre-determined coverage conclusions for COVID-19 claims without consideration of the particular facts or applicable law constitutes an unfair or deceptive act or practice in the business of insurance pursuant to subdivisions (1), (2), and (7) of Section 541.060. FM Global's use of the FM Talking Points designed to coach its claim adjusters to steer the policyholder to the On-Site Communicable Disease Coverages also constitutes an unfair or deceptive act or practice in the business of insurance pursuant to subdivisions (1), (2), and (7) of Section 541.060.

326. FM Global's systemic practice and policy of denying coverage for COVID-19 without conducting an adequate investigation of the facts and the applicable law constitutes an unfair or deceptive act or practice in the business of insurance pursuant to subdivisions (1), (2), and (7) of Section 541.060.

327. FM Global has failed to adopt and implement reasonable standards for the prompt investigation and processing of COVID-19 claims, which constitutes a violation of subdivisions (2), (3), and (4) of Section 541.060.

328.   FM Global's systemic practices and procedures of restricting recovery to the limited coverage available for **communicable disease** compelled Cinemark to institute this litigation to recover amounts due under the Policy.  FM Global's acts constitute a violation of subdivisions (2) and (7) of Section 541.060.

329.   As a result of FM Global's unfair or deceptive acts or practices, Cinemark has suffered and is continuing to suffer damages.

330.   Cinemark is entitled to an award of damages because of FM Global's unfair or deceptive acts or practices in an amount to be determined at trial, including attorney's fees, pre- and post-judgment interest and any other costs and relief that this Court deems appropriate.

## **PRAYER**

WHEREFORE, Cinemark prays for judgment against FM Global as follows:

a.   Cinemark be awarded a judgment declaring that:

　1.   Each of the coverage provisions identified herein is triggered by Cinemark's claim;

　2.   No exclusion in the Policy applies to bar or limit coverage for Cinemark's claim;

　3.   FM Global has breached the Policy by failing to pay Cinemark claim;

　4.   FM Global violated the implied covenant of good faith and fair dealing;

　5.   FM Global violated Section 541.060 of the Texas Insurance Code; and

　6.   Any other declaratory relief that would be useful to the resolution of the dispute between the parties;

b.   Cinemark be awarded its damages resulting from FM Global's breach of the Policy, including pre-judgment and post-judgment interest;

c.   Cinemark be awarded punitive and exemplary damages resulting from FM Global's breach of good faith and fair dealing;

**Plaintiffs' Second Amended Complaint and Demand for Jury Trial – Page 55**

d.       Cinemark be awarded special and consequential damages against FM Global in an amount to be proved at trial;

e.       Cinemark be awarded treble damages as permitted under the Texas Insurance Code;

f.       Cinemark be awarded an order enjoining FM Global's improper denial of benefits under the Policy;

g.       Cinemark be awarded its reasonable and necessary attorneys' fees and court costs; and

h.       Cinemark be awarded such other and further relief, general or special, at law or in equity, to which it may be justly entitled.

## DEMAND FOR JURY TRIAL

Cinemark demands trial by jury on all issues so triable.

Respectfully submitted,

**HUNTON ANDREWS KURTH LLP**

_Melissa R. Smith_
Melissa R. Smith
Texas Bar No. 24001351
GILLAM & SMITH, LLP
303 South Washington Avenue
Marshall, Texas 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
melissa@gillamsmithlaw.com

Jarrett L. Hale
Texas Bar No. 24046005
Abigail M. Lyle
Texas Bar No. 24095189
Michael Horne
Texas Bar No. 24083200
Hunton Andrews Kurth LLP
1445 Ross Avenue, Suite 3700
Dallas, TX  75202
Telephone: (214) 979-3000
jhale@huntonAK.com
alyle@huntonAK.com
mhorne@huntonAK.com

Michael S. Levine*
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, D.C. 20037-1701
Telephone: (202) 955-1857
mlevine@huntonAK.com

Rachel E. Hudgins*
Hunton Andrews Kurth LLP
Bank of America Plaza, Suite 4100
600 Peachtree Street, NE
Atlanta, GA  30308
Telephone:  (404) 888-4000
rhudgins@huntonAK.com

Michael L. Huggins*
Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111
Telephone:  (415) 975-3744
mhuggins@huntonAK.com

Casey L. Coffey*
Hunton Andrews Kurth LLP
333 SE 2nd Avenue, Suite 2400
Miami, FL 33131
Telephone: 305-810-2500
ccoffey@huntonAK.com

**Attorneys for Plaintiffs**

**\*** Admitted *Pro hac vice.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 19, 2021, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system which will send notification of such filing to the

following:

Thomas Cook
Texas Bar No. 00783869
tcook@zelle.com

Michael P. O'Brien
Texas Bar No. 24103418
mobrien@zelle.com
901 Main Street, Suite 4000
Dallas, TX 75202-3975
Telephone: 214-742-3000
Facsimile: 214-760-8994
**Attorneys for Defendant**
**Factory Mutual Insurance Company**

                    */s/ Melissa R. Smith*
                    Melissa R. Smith