**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| CINEMARK HOLDINGS, INC., *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 4:21-cv-11-ALM |
| | § | |
| FACTORY MUTUAL INSURANCE | § | |
| COMPANY, | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT .................................................................1

II.    STATEMENT OF FACTS ......................................................................2

    A.    Cinemark Suffered Physical Loss Or Damage To Its Property As A
        Result Of COVID-19. ..........................................................................2

    B.    The Policy. ...........................................................................................5

    C.    FM Denied Cinemark's Claim In Bad Faith.........................................7

III.   LEGAL STANDARD.............................................................................8

    A.    The Rule 12(c) Standard. ....................................................................8

    B.    Interpretation of Insurance Policies. ...................................................9

IV.  CINEMARK'S LOSS OR DAMAGE FALLS WITHIN THE SCOPE OF
    COVERAGE.........................................................................................10

    A.    Cinemark Suffered "Damage" Because COVID-19 Harmed The Air
        And Surfaces Of Its Property..............................................................11

    B.    Cinemark Suffered "Physical Loss" Because COVID-19 Tangibly
        Altered Its Property............................................................................12

    C.    The Policy Explicitly Acknowledges that Communicable Disease May
        Cause Loss or Damage........................................................................14

    D.    FM Has Admitted That Loss of Functionality Is Sufficient. ............14

    E.    Cases In Which The Plaintiff Did Not Even Allege The Physical
        Presence Of COVID-19 On Its Property Have No Application Here. ............15

    F.    Other Decisions Enforcing Coverage for COVID-19 Losses Are
        Evidence That Cinemark's Interpretation Is Reasonable.................18

V.    FM CANNOT ESTABLISH THAT ANY EXCLUSIONS APPLY..........19

    A.    The Contamination Exclusion Does Not Apply. .............................19

        1.    FM's Interpretation of the Contamination Exclusion Conflicts With the
                Communicable Disease Coverages.....................................................20

        2.    The Contamination Exclusion Only Applies to "Costs" And Does Not
                Apply to Cinemark's Losses.............................................................22

        3.    The Contamination Exclusion Reasonably Applies to Traditional
                Industrial Pollutants and Does Not Encompass Viruses Like COVID-
                19.......................................................................................................24

        4.    FM Cannot Establish that Cinemark's Construction Is Unreasonable.
                .............................................................................................................26

    B.    The Loss of Use Exclusion Does Not Apply. .................................27

VI.  THE COMMUNICABLE DISEASE SUBLIMIT DOES NOT APPLY. ..................28

VII. FM ACTED IN BAD FAITH. .....................................................................29

VIII. CONCLUSION........................................................................................30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aetna Cas. & Sur. Co. v. Garza*,
    906 S.W.2d 543, 550 (Tex. Ct. App. 1995) ........................................................30

*American Motorists Ins. Co. v. Trane Co.*,
    718 F.2d 842 (7th Cir. 1983) ...............................................................................23

*Amica Mut. Ins. Co. v. Moak*,
    55 F.3d 1093 (5th Cir. 1995) ...........................................................................9, 10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...............................................................................................8

*Asure Software, Inc. v. Meeting Maker Holding*,
    No. A-13-CA-051-SS, 2013 WL 12182055 (W.D. Tex. Aug. 19, 2013) .............8, 9

*ATOFINA Petrochemicals, Inc. v. Continental Cas. Co.*,
    185 S.W.3d 440, 444 (Tex. 2005) ........................................................................27

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...............................................................................................8

*Choctaw Nation of Oklahoma v. Lexington Ins. Co.*,
    No. CV-20-42, 2021 WL 714032 (D. Okla. Jan. 27, 2021) ..................................26

*In Re CommVault Sys., Inc. Secs. Litig.*,
    No. 14-CV-5628 (PGS), 2016 WL 5745100, at *4 (D.N.J. Sept. 30, 2016) .............9

*de Laurentis v. United Servs. Auto. Ass'n*,
    162 S.W.3d 714 (Tex. Ct. App. 2005) .................................................................13

*Diesel Barbershop, LLC v. State Farm Lloyds*,
    479 F. Supp. 3d 353 (W.D. Tex. 2020) ...........................................................18, 26

*Dino Palmieri Salons, Inc. v. State Auto. Mut. Ins. Co.*,
    No. CV-20-932117, 2020 WL 7258114 (Ohio Ct. Com. Pl. Nov. 17, 2020) .........19

*Essex v. BloomSouth Flooring Corp.*,
    562 F.3d 399 (1st Cir. 2009) ...............................................................................15

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
    720 F.3d 33 (1st Cir. 2013) ....................................................................................9

*Flagship Credit Corp. v. Indian Harbor Ins. Co.*,
    481 F. App'x 907, 912 (5th Cir. 2012) ...............................................................25

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) .........................................................................8

*Goodwill Indus. of Orange Cty. California v. Philadelphia Indem. Ins. Co.*,
    No. 30-2020-01169032-CU-IC-CXC, 2021 WL 476268 (Cal. Super. Ct. Jan.
    28, 2021) .................................................................................................19

*Great Am. Ins. Co. of N. Y. v. Compass Well Servs., LLC*,
    No. 02-19-00373-CV, 2020 WL 7393321 (Tex. Ct. App. Dec. 17, 2020)...........................13

*Gregory Packaging, Inc. v. Travelers Property and Casualty Company of
    America*,
    Civ. No. 2:12-cv-04418 2014 U.S. Dist. LEXIS 165232, 2014 WL 6675934
    (D. N.J. 2014)............................................................................................15

*Hajer v. Ohio Sec. Ins. Co.*,
    No. 6:20-CV-00283, 2020 WL 7211636 (E.D. Tex. Dec. 7, 2020) ................................18, 26

*Henderson Road Restaurant Systems, Inc. v. Zurich American Ins. Co.*,
    No. 1:20-CV-1239, 2021 WL 168422, at *14 (N.D. Ohio Jan. 19, 2021) ...........13–14, 27–28

*Home Depot, U.S.A., Inc. v. Fed. Ins. Co.*,
    241 F. Supp. 2d 702 (E.D. Tex. 2003) ...........................................................10

*Independence Barbershop, LLC v. Twin City Fire Ins*.
    Co., No. A-20-00555-JRN, 2020 WL 6572428 (W.D. Tex. Nov. 4, 2020) ..........................5

*Ins. Distribution Consulting, LLC v. Freedom Equity Grp., LLC*,
    No. 3:20-CV-00096 2020 WL 5803249, at *4 (S.D. Tex. Sept. 4, 2020) ..........................30

*JGB Vegas Retail Lessee, LLC v. Starr Surplus Lines Ins. Co.*,
    No. A-20-816628-B, 2020 WL 7190023 (Nev. Dist. Ct. Nov. 30, 2020) ........................19, 25

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*,
    906 F.2d 884 (2d Cir. 1990).........................................................................27

*Meyer Nat. Foods, LLC v. Liberty Mut. Fire Ins. Co.*,
    218 F. Supp. 3d 1034, 1038 (D. Neb. 2016)......................................................26

*Mid-Continent Cas. Co. v. Bay Rock Operating Co.*,
    614 F.3d 105 (5th Cir. 2010) ..................................................................10, 19

*Mohawk Gaming Enters., LLC v. Affiliated FM Ins. Co.*,
    2020 WL 3467893 (N.D.N.Y. June 23, 2020).....................................................18

*Murray v. State Farm Fire and Cas. Co.*,
    509 S.E.2d 1, 9 n.5 (W. Va. 1998)................................................................10, 19

*Nassar v. Liberty Mut. Fire Ins. Co.*,
    508 S.W.3d 254 (Tex. 2017)............................................................... *passim*

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*,
    811 S.W.2d 552 (Tex. 1991)........................................................................23

*Neitzke v. Williams*,
    490 U.S. 319 (1989)......................................................................................9

*Ocasio-Hernandez v. Fortuno-Burset*,
    640 F.3d 1 (1st Cir. 2011)..............................................................................9

*Paternostro v. Choice Hotel Int'l Servs. Corp.*,
    No. CIV.A. 13-0662, 2014 WL 6460844 (E.D. La. Nov. 17, 2014) ......................25

*Port Authority of N.Y. and N.J. v. Affiliated FM Ins. Co.*,
    311 F.3d 226 (3d Cir. 2002)........................................................................15

*RSUI Indem. Co. v. The Lynd Co.*,
    466 S.W.3d 113 (Tex. 2015)............................................................... *passim*

*Selery Fulfillment, Inc. v. Colony Ins. Co.*,
    No. 4:20-CV-853, 2021 WL 963742 (E.D. Tex. Mar. 15, 2021) ..................2, 16, 17

*Solvent Underwriters v. Furmanite America, Inc.*,
    282 S.W.3d 661 (Tex. Ct. App. 2009)........................................................10, 22

*Southern Dental Birmingham LLC v. Cincinnati Ins. Co.*,
    No. 2:20-CV-681-AMM, 2021 WL 1217327 (N.D. Ala. Mar. 19, 2021).................16, 19

*State Farm Fire & Cas. Co. v. Simmons*,
    963 S.W.2d 42, 44 (Tex. 1998)....................................................................30

*Studio 417, Inc. v. Cincinnati Ins. Co.*,
    478 F. Supp. 3d 794, 800 (W.D. Mo. 2020) ...................................................19

*Tech Pharmacy Servs., LLC v. Aliza Rx LLC*,
    No. 4:15-CV-766, 2016 WL 4272412 (E.D. Tex. Aug. 15, 2016)............................8

*Terry Black's Barbecue, LLC v. State Auto. Mut. Ins. Co.*,
    No. 1:20-CV-665-RP, 2021 WL 972878 (W.D. Tex. Jan. 21, 2021).......................18

*Thor Equities, LLC v. Factory Mutual Ins. Co.*,
    No. 20 Civ. 3380 (AT), 2021 WL 1226983 (S.D.N.Y. Mar. 31, 2021) .............23, 24, 27

*TRAVCO Ins. Co. v. Ward*,
    715 F. Supp. 2d 699 (E.D. Va. 2010) .................................................................15

*Urogynecology Specialist of Fla. LLC v. Sentinel Ins. Co.*,
    No. 6:20-cv-1174, 2020 WL 5939172 (M.D. Fla. Sept. 24, 2020).........................25

*Vizza Wash, LP v. Nationwide Mut. Ins. Co.*,
    No. 5:20-CV-00680-OLG, 2020 WL 6578417 (W.D. Tex. Oct. 26, 2020) ...................18, 26

*Western Fire Insurance Co. v. First Presbyterian Church*,
    437 P.2d 52 (Colo. 1968)..............................................................................1, 15

*Williams v. Marshall Reg'l Med. Ctr. Found.*,
    No. 2:07-CV-456-DF-CE, 2009 WL 838239 (E.D. Tex. Mar. 25, 2009) ................9

*Yates v. United States*,
    574 U.S. 528 (2015)..........................................................................................25

*Ybarra Invs. Inc. v. Scottsdale Ins. Co.*,
    No. 2020-25079, 2020 WL 7416720 (333rd Dist. Ct. Harris County, Tex. Dec.
    10, 2020) ..........................................................................................................18

**Other Authorities**

*Cost*, Black's Law Dictionary (11th ed. 2019) ............................................................24

Damage, Cambridge Dictionary,
    https://dictionary.cambridge.org/us/dictionary/english/damage;..............................11

Damage, Dictionary.com, https://www.dictionary.com/browse/damage ......................11

Damage, Macmillan Dictionary,
    https://www.macmillandictionary.com/us/dictionary/american/damage_1; ............11

Fed. R. Civ. P. 8(a)(2)..................................................................................................8

Fed. R. Civ. P. 12(b) ................................................................................................8, 12

Fed. R. Civ. P. 12(c) ...........................................................................................2, 8, 18

Loss, Cambridge Dictionary,
    https://dictionary.cambridge.org/us/dictionary/english/loss?q=Loss; ....................13

Loss, Macmillan Dictionary,
    https://www.macmillandictionary.com/us/dictionary/american/loss......................13

Loss, Merriam-Webster, https://www.merriamwebster.com/dictionary/loss;................13

# I. PRELIMINARY STATEMENT

This is a lawsuit brought by plaintiffs Cinemark Holdings, Inc.; Cinemark Partners II, Ltd.; Greeley, Ltd.; and Laredo Theatre, Ltd. (collectively, "Cinemark") against Factory Mutual Insurance Company ("FM"), based on FM's summary denial of coverage for Cinemark's claim for business interruption losses insured under multiple parts of a comprehensive policy drafted and sold by FM.

The Policy, unlike most others, specifically covers loss and damage caused by "communicable disease." Now, more than a year after directing its adjusters to deny *all* COVID-19 business interruption claims, regardless of the facts or applicable law, and a full year after receiving Cinemark's claim, FM hides behind "the great majority" of rulings from *other courts* based on *other facts* and *other law* to ratify its misconduct *ex post facto* and avoid disclosing documents and information that will reveal its plan and demonstrate its bad faith misconduct. But this case is fundamentally different than those that FM relies on. When adjudicated on *these facts* and *this law*, FM's Motion for Judgment on the Pleadings ("Motion") must fail for at least three fundamental reasons:

*First*, the Policy expressly includes "communicable disease," which FM agrees encompasses COVID-19, as a covered cause of loss. This provides critical context when interpreting the undefined phrase "physical loss or damage," as used in *this* Policy.

*Second*, COVID-19 was *actually present* on Cinemark's property. The complaint details how COVID-19 caused physical loss and damage at all of Cinemark's locations when people (customers and employees) infected with COVID-19 shed the causative virus, SARS-CoV-2. SARS-CoV-2 changed the content of the indoor air and the character of the surfaces (both insured property) throughout the locations through the addition of a highly contagious and potentially deadly disease particulate. This process causes physical loss because SARS-CoV-2 is

a physical, corporeal object that makes property unfit for its ordinary, safe use absent extraordinary controls, mitigation, and repair. It also causes physical damage because it causes a physical, tangible, demonstrable change to the air and surfaces. The damage can't be cleaned because of shedding, spreading and reintroduction and it isn't temporary (for the same reason).

At the very least, these are all disputes of fact that cannot be decided under Rule 12.

Furthermore, FM relies on a series of cases, including this Court's recent decision in *Selery Fulfillment, Inc. v. Colony Insurance Co.*, where plaintiffs do not allege, much less demonstrate, that COVID-19/SARS-CoV-2 was actually present and actually damaged the insured property. Those cases are based *solely* on government orders. Indeed, this Court expressly noted that no such allegations were made in *Selery*. No. 4:20-CV-853, 2021 WL 963742, at *6 (E.D. Tex. Mar. 15, 2021)

***Third***, no exclusion applies. The Policy does not include a standard virus exclusion. Instead, it *includes* coverage for communicable diseases like COVID-19. Although the Policy contains a contamination exclusion, it does not and cannot apply here. FM's view of the exclusion would effectively read the communicable disease coverage out of the Policy and is therefore unreasonable. Despite FM's mythologizing, there is no exception to the exclusion for communicable diseases. Likewise, FM's so-called "loss of use" exclusion cannot apply in the face of clear coverages for financial loss resulting from "physical loss or damage," including that caused by communicable disease.

## II. STATEMENT OF FACTS

### A. Cinemark Suffered Physical Loss Or Damage To Its Property As A Result Of COVID-19.

Cinemark is the third largest movie theater circuit in the United States and owns over 500 theaters worldwide. (Compl. ¶ 13.) In order to protect its property, Cinemark purchased an

"All Risks" insurance policy from FM, with policy number 1051832.  (Ans. ¶ 15.)  The Policy is not a standard commercial property insurance policy.  Rather, it expressly includes coverage for physical loss or damage by a communicable disease.  (Compl. ¶ 2.)  In exchange for the coverage provided by this unique Policy, Cinemark paid over $3.7 million in premiums to FM.  (*Id.* at ¶ 40).  But when Cinemark suffered a covered loss because COVID-19 on its property caused physical loss or damage, FM executed a preconceived plan and summarily denied Cinemark's claim.  (*Id.* at ¶ 226–27.)

COVID-19 is a deadly communicable disease caused by the virus SARS-CoV-2.  (*Id.* at ¶¶ 41, 138.)  It is highly contagious and spreads in several ways, changing the content of air and character of surfaces at Cinemark's property, turning both into mechanisms for the spread of disease.  (*Id.* at ¶¶ 46, 72.)  Beginning in March 2020, COVID-19 has been continuously physically present at, and causing loss and damage to each of Cinemark's locations, rendering them unsafe, uninhabitable, and unfit for normal use.  (*Id.* at ¶¶ 71, 82, 90–92, 114, 145–146.)  As a direct result of the damage caused by COVID-19 to its property, Cinemark was forced to close its theaters, incurring business income loss.  (*Id.* at ¶ 81.)

Over 1,700 Cinemark employees have tested positive for, were exposed to, or displayed symptoms of COVID-19.  (*Id.* at ¶¶ 84–87, 145.)  At least 14 of these employees were exposed to COVID-19 *while at Cinemark's property*, and the vast majority were on Cinemark's property just before testing positive.  (*Id.* at ¶¶ 88, 145.)  Furthermore, between March and November 2020, over 3.6 million guests, many of whom were sick, visited Cinemark's locations.  (*Id.* at ¶ 89.)  Certain of these individuals introduced COVID-19 to Cinemark's property, and others were infected while on Cinemark's property via the damaged property.

Infected persons "shed" viral particles by discharging infectious respiratory droplets

containing viral RNA. (*Id.* at ¶¶ 47, 54.) Droplets of saliva and nasal discharge smaller than 50 microns in diameter—known as "aerosols"— can remain in the air for hours. (*Id.* at ¶¶ 46–49.) As a result, aerosols can spread via air circulation systems in Cinemark's buildings and infect new people at a much greater distance hours after the original infected person has left. (*Id.* at ¶¶ 48–49.)

Once respiratory droplets containing COVID-19 fall, they also tangibly affect physical surfaces at Cinemark's property. The viral particles attach to the surface, transforming it into a "fomite." (*Id.* at ¶¶ 51, 64.) A person who touches a fomite can get sick with COVID-19. (*Id.*) Fomites beget more fomites when they come into contact with other physical surfaces and reintroduce viral particles into the air when moved. (*Id.* at ¶ 65.) COVID-19 can exist on fomites for days—up to 28 days according to one study—and has been detected on surfaces even *after* the surface has been sanitized. (*Id.* at ¶¶ 66–70; Ex. M at 242.)[1] This creates a damage continuum: infected persons shed viral particles which change the air, the particles eventually settle on and alter surfaces. This cycle is repeats with each infected person.

In an effort to mitigate its business income loss, Cinemark reopened its theaters and operated to the best of its ability. (*Id.* at ¶ 77.) But this meant that infected people continued to visit and shed viral particles, making it impossible to fully remove COVID-19 from Cinemark's property. (*Id.* at ¶¶ 79–81, 142–143.) Because infected persons are most contagious while pre-symptomatic or asymptomatic, it is difficult to detect and prevent the entry of infected persons. (*Id.* at ¶¶ 54–59, 151.) It is also impossible to isolate the portion of the property that has been damaged because COVID-19 spreads via ventilation systems and is invisible to the naked eye.

---

[1] Citations to Ex. refer to the exhibits to the Second Amended Complaint, and page numbers refer to the COMPLAINT bates numbers. Citations to Mot. Ex. refer to the exhibits to FM's Motion for Judgment on the Pleadings.

Ordinary cleaning measures are insufficient to restore the property to full use—only extraordinary measures, such as specialized air filtration systems and operating at reduced capacity can mitigate and control the loss and damage caused by COVID-19. (*Id.* at ¶¶ 50, 77.)

**B. The Policy.**

The Policy is fundamentally different than most commercial property insurance policies because it expressly covers physical loss or damage by a communicable disease. The Policy insures "against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy." (Ex. A. at 8.) The Policy also "insures TIME ELEMENT loss…directly resulting from physical loss or damage of the type insured."[2] (*Id.* at 48.)

The Policy covers communicable disease under two additional coverages (the "Communicable Disease Coverages"). Both are triggered when an insured location "has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited" as a result. (*Id.* at 33–34, 68 (bold in original).) First, the Communicable Disease Response section "covers the reasonable and necessary costs incurred by the Insured . . . for the . . . cleanup, removal and disposal of the actual not suspected presence of **communicable diseases** from insured property." (*Id.* at 33–34 (bold in original).) Second, the Interruption by Communicable Disease section covers "the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY at such **location** with the actual not suspected presence of **communicable disease**." (*Id.* at 68 (bold in original).) The Policy defines "communicable disease" as "disease which is . . . transmissible from human to

---

[2] "'Time Element Coverage' is a term of art in the insurance industry referring to coverages measured in time," including for lost business income. *Independence Barbershop, LLC v. Twin City Fire Ins*. Co., No. A-20-00555-JRN, 2020 WL 6572428, at *4 (W.D. Tex. Nov. 4, 2020).

human by direct or indirect contact with an affected individual or the individual's discharges." (*Id.* at 81.) The Policy expressly contemplates that communicable diseases can cause loss or damage by excluding "loss or damage caused by or resulting from terrorism" from the Communicable Disease Coverages. (*Id.* at 33, 68.)

But the Policy does not say that the Communicable Disease Coverages are the *only* coverages applicable to physical loss or damage caused by a communicable disease. On contrary, not only are other coverages triggered because of physical loss and damage at Cinemark's locations, other coverages, such as the Policy's Time Element coverage, are triggered when Cinemark's operations are disrupted by "physical loss or damage *of the type insured.*" (*Id.* at 48 (emphasis added).) Because loss or damage caused by "communicable disease" is "loss or damage of the type insured," such loss or damage necessarily triggers the Policy's Time Element coverage.[3]

No exclusion applies to Cinemark's claim. However, in its Motion, FM invokes the Contamination Exclusion, which reads:

> This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:
>
> 1) **contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy. If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination** may be insured. This exclusion D1 does not apply to radioactive contamination which is excluded elsewhere in this Policy.

(*Id.* at 25 (bold in original).) The Policy defines "contamination" as "any condition of property

---

[3] Additionally, the Policy contains several other coverages triggered by "physical loss or damage" resulting from the presence of COVID-19 at either an insured location or another location specified in the Policy: Protection and Preservation of Property (*Id.* at 42–43), Extra Expense (*Id.* at 53–54), Civil or Military Authority (*Id.* at 61), Contingent Time Element Extended Coverage (*Id.* at 62), Ingress/Egress (*Id.* at 62–63), Logistics Extra Cost (*Id.* at 63–64), and Attraction Property (*Id.* at 66). Cinemark is also entitled to coverage under the Claims Preparation Costs, which covers Cinemark's costs in preparing a covered claim. (*Id.* at 32–33.)

due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew."[4]  (*Id.* at 81.)  The definition does not include "communicable disease," meaning that the Communicable Disease Coverages are not an "exception" to the Contamination Exclusion.  FM also invokes an exclusion which reads "This Policy excludes . . . loss of market or loss of use" ("Loss of Use Exclusion"), which also does not apply for the reasons explained below.  (*Id.* at 21.)

### C.  FM Denied Cinemark's Claim In Bad Faith.

Cinemark notified FM of its claim on April 20, 2020.  (*Id.* at ¶¶ 228; Ex. E.)  FM reserved its right to limit or deny coverage, but did not investigate Cinemark's claim, and merely requested information Cinemark had already provided.  (*Id.* at ¶¶ 229–233; Ex. F.)  Cinemark updated FM as new information became available, but FM never bothered to do anything with this information. In fact, in the seven months between when Cinemark provided notice of the claim and filed suit, FM never issued a coverage position.  (Compl.  ¶¶ 236–242; Exs. H–K.)

FM's delayed response and effective denial of Cinemark's claim is part of a broader pattern of its bad faith COVID-19 claims handling.  In "talking points" FM directed its adjusters to deny the most valuable coverages applicable to COVID-19 claims in favor of only the limited Communicable Disease Coverages.  These "talking points" fail to acknowledge many different triggers of coverage under the Policy, falsely (and without any factual basis) deny that COVID-19 causes physical damage, and steer adjusters to only seek information regarding the Communicable Disease Coverages.  (Compl. ¶¶ 244–257; Ex. G.)  And even then, FM never provided Communicable Disease Coverage.

---

[4] The Policy autologically defines "contaminant" as "anything that causes contamination."  (*Id.* at 81.)

## III. LEGAL STANDARD

### A. The Rule 12(c) Standard.

The standard for a Rule 12(c) motion for judgment on the pleadings is the same as the standard for a Rule 12(b) motion to dismiss. *Tech Pharmacy Servs., LLC v. Aliza Rx LLC*, No. 4:15-CV-766, 2016 WL 4272412, at *1 (E.D. Tex. Aug. 15, 2016). To survive a Rule 12 motion, a complaint should contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This "short and plain statement" need only provide enough detail to give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To "show" an entitlement to relief, the complaint "must be factually suggestive, so as 'to raise a right to relief above the speculative level.'" *Id.* at 555.

The Court must accept as true all factual allegations that are not legal conclusions or "[t]hreadbare recitals of the elements of a cause of action," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and it must construe them in the light most favorable to the plaintiff, *Tech Pharmacy Servs.*, 2016 WL 4272412, at *1; *Bowling*, 2019 WL 4463466, at *2. The Court must do so regardless of whether the Court believes them, finds them incredible, or believes that proof of the facts is improbable. *Tech Pharmacy Servs.*, 2016 WL 4272412, at *1. This is because "a district court ruling on a motion to dismiss is not sitting as a trier of fact." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556). "[T]he court's skepticism is best reserved for later stages of the proceedings." *Asure Software, Inc. v. Meeting Maker Holding*, No. A-13-CA-051-SS, 2013 WL 12182055, at *3 (W.D. Tex. Aug. 19, 2013). "Rule 12(b)(6) does not countenance dismissals based on a judge's disbelief of a complaint's factual allegations."

*Williams v. Marshall Reg'l Med. Ctr. Found.*, No. 2:07-CV-456-DF-CE, 2009 WL 838239, at *2
(E.D. Tex. Mar. 25, 2009) (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)). "Nor may a
court attempt to forecast a plaintiff's likelihood of success on the merits." *Ocasio-Hernandez v.
Fortuno-Burset*, 640 F.3d 1, 12–13 (1st Cir. 2011).

The Court must draw all reasonable inferences in favor of the plaintiff. *Asure Software*,
2013 WL 12182055, at *2. It may not choose between two plausible inferences that may be
drawn from factual allegations, because it is not the Court's role, at the pleading stage, to decide
which inferences are *more* plausible. *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d
33, 45 (1st Cir. 2013). The Court may consider any documents attached to the complaint. *Asure
Software*, 2013 WL 12182055, at *2.[5]

**B.  Interpretation of Insurance Policies.**

The same principles of interpretation apply to insurance policies as to all other contracts.
*Amica Mut. Ins. Co. v. Moak*, 55 F.3d 1093, 1095 (5th Cir. 1995). The Court must "examine the
entire agreement and seek to harmonize and give effect to all provisions so that none will be
meaningless." *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 258 (Tex. 2017). This
requires consideration of all parts of the policy so that undefined terms are interpreted in context.
*Id.* When determining if an interpretation is reasonable, decisions of other courts interpreting the
*same* language are persuasive, and a jurisdiction split is evidence of multiple reasonable
interpretations and therefore ambiguity. *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118
(Tex. 2015) ("When construing an insurance policy, we are mindful of other courts'
interpretations of policy language that is identical or very similar to the policy language at

---

[5] FM contends that the Court cannot consider the expert reports attached to the complaint as Exhibits M and N.
(Mot. at 18.) However, in ruling on a motion to dismiss, a Court may consider expert reports attached to and
"adequately incorporated into" a complaint. *See, e.g., In Re CommVault Sys., Inc. Secs. Litig.*, No. 14-CV-5628
(PGS), 2016 WL 5745100, at *4 (D.N.J. Sept. 30, 2016) (considering expert reports in denying motion to dismiss).

issue"); *Murray v. State Farm Fire and Cas. Co.*, 509 S.E.2d 1, 9 n.5 (W. Va. 1998) ("A provision in an insurance policy may be deemed to be ambiguous if courts in other jurisdictions have interpreted the provision in different ways.").

If multiple interpretations are reasonable, the policy is ambiguous. *Nassar*, 508 S.W.3d at 258. The test is not which party advances the *more* reasonable interpretation. Rather, the test is whether there is *more than one* reasonable interpretation. If there is, the Court "must resolve the uncertainty by adopting the construction that most favors the insured." *Id.* (quoting *RSUI Indem. Co.*, 466 S.W.3d at 118); *see also Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 114 (5th Cir. 2010) (same). The Court must apply the construction most favorable to the policyholder, "even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." *Nassar*, 508 S.W.3d at 258. Furthermore, when an ambiguity exists, the Court cannot rewrite the policy to cure the lack of clarity. *Amica Mut. Ins. Co.*, 55 F.3d at 1095; *Solvent Underwriters v. Furmanite America, Inc.*, 282 S.W.3d 661, 670 (Tex. Ct. App. 2009) (rejecting insurer's entreaty to rewrite policy).

Finally, if, as here, the insurer claims that coverage is barred by an exclusion, the insurer carries the burden of proving it applies. *Home Depot, U.S.A., Inc. v. Fed. Ins. Co.*, 241 F. Supp. 2d 702, 706 (E.D. Tex. 2003).

## IV. CINEMARK'S LOSS OR DAMAGE FALLS WITHIN THE SCOPE OF COVERAGE.

The Policy "covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded." (Ex. A at 8.) Cinemark plausibly alleged that it suffered "direct physical loss or damage" under the plain meaning of those terms. It suffered direct physical loss of property: COVID-19 and SARS-CoV-2, by their actual presence in the air and on surfaces, caused Cinemark's property to become physically

10

unfit for human habitation and physically unusable for its insured purpose. It suffered direct physical damage to property: its property suffered a physical alteration that adversely affected its functionality or use because COVID-19 and SARS-CoV-2 (1) physically altered the composition of the air to contain infectious particles and (2) physically attached to and resides on surfaces. The loss and damage is physical (not incorporeal), tangible, and demonstrable. Nor is the loss and damage ephemeral because of shedding, spreading and reintroduction.

### A. Cinemark Suffered "Damage" Because COVID-19 Harmed The Air And Surfaces Of Its Property.

The Policy does not define "damage" and the Court should apply the plain meaning of the word. Dictionaries define the term as "physical harm caused to something so that it is broken, spoiled, or injured," "harm or injury," and "injury or harm that reduces value or usefulness."[6]

Cinemark has plausibly alleged that COVID-19 tangibly changes the content of the air and character of surfaces by transforming them into mechanisms for the transmission of a deadly disease. Infected individuals "shed" viral particles and discharge respiratory droplets that contain viral particles. (Compl. ¶¶ 46–49, 54.) These "aerosols" can linger in the air for hours—long after the infected person has left the area—and can spread to other parts of the building via ventilation systems. (*Id.* at ¶ 48.) Uninfected individuals who inhale these aerosols can become sick. (*Id.* at ¶ 46.) In this way, COVID-19 renders the air unsafe.

Similarly, COVID-19 harms surfaces. Viral particles can attach to the surface—turning it into a "fomite"—and remain there for days or weeks. (*Id.* at ¶¶ 51, 64–70.) Undamaged surfaces coming into contact with a fomite also become fomites, and individuals who touch

---

[6] Damage, Macmillan Dictionary, https://www.macmillandictionary.com/us/dictionary/american/damage_1; Damage, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/damage; Damage, Dictionary.com, https://www.dictionary.com/browse/damage.

fomites can become infected.  (*Id.* at ¶¶ at 64–65.)

FM contends that Cinemark has not suffered damage because it can simply clean its property to remove COVID-19.  (Mot. at 17.)  But this is not true, or at most is a disputed fact unripe for determination under Rule 12; cleaning measures are inadequate to repstore the property damaged by COVID-19.  Studies have found that COVID-19 can be found on fomites after the surface has been sanitized.  (Ex. M at 242.)  COVID-19 can only be removed from the air in Cinemark's buildings by use of specialized filters.  (Compl. ¶ 50.)  Even with state-of-the-art controls, as long as Cinemark continues to operate (even at reduced capacity), guests and employees will continuously reintroduce COVID-19 around Cinemark's property, rendering cleaning efforts ineffective.  (*Id.* at ¶ 71.)  Because there is no commercially-available technology to detect COVID-19 particles, affected areas of the property cannot be isolated and closed.  (*Id.* at ¶ 83.)  As a result, extraordinary measures (initially closure, and now mitigation controls) are required to repair the damage and rectify the loss.

COVID-19 was present on Cinemark's property.  Prior to shutting down, infected guests and employees shed SARS-CoV-2 at the facilities.  Closing was an effective way to mitigate the problem, but, since reopening, the loss and damage have recommenced.  Cinemark is aware of over 1,700 Cinemark employees who tested positive for COVID-19, displayed symptoms of COVID-19, or were exposed to COVID-19 between June and November 2020.  (Compl. ¶¶ 84–87, 145.)  Additionally, because of the prevalence of COVID-19 in the community, a substantial number of guests were sick and shedding viral particles while on Cinemark's property.  (*Id.* at ¶¶ 71, 89–92, 114, 145–146.)

**B.  Cinemark Suffered "Physical Loss" Because COVID-19 Tangibly Altered Its Property.**

Separate from "physical damage"—which, as discussed above, occurs when property

undergoes a physical alteration when COVID-19/SARS-CoV-2 changes the composition of air and transforms the character of surfaces—"physical loss" occurs "if the property is in an initial satisfactory state that is changed by an external event into an unsatisfactory state." *Great Am. Ins. Co. of N. Y. v. Compass Well Servs., LLC*, No. 02-19-00373-CV, 2020 WL 7393321, at *14 (Tex. Ct. App. Dec. 17, 2020). Where physical loss must be "tangible"—it has occurred where there is "a distinct, demonstrable, physical alteration of the property." *Id.*; *see also de Laurentis v. United Servs. Auto. Ass'n*, 162 S.W.3d 714, 723 (Tex. Ct. App. 2005) (presence of mold on property constituted physical loss). Physical loss also can be satisfied by "loss of function" or where the property's "function and value have been seriously impaired." *Great Am. Ins. Co.*, 2020 WL 7393321, at *14. This is in accord with the "ordinary and generally accepted meaning" of the word "loss." *Nassar*, 508 S.W.3d at 258. Dictionaries define "loss" as "[d]eprivation," "decrease in amount, magnitude, or degree," "[t]he fact that you no longer have something or have less of something," and "[h]aving less than before."[7]

The introduction of COVID-19 onto Cinemark's property is an "external force" that has changed the property into an "unsatisfactory state" by making it uninhabitable without mitigation efforts. As a result, Cinemark lost full functional use of its property. COVID-19 viral particles are present in the air at Cinemark's locations and attached themselves to surfaces in Cinemark's property, transforming them into dangerous mechanisms for disease transmission.[8]

---

[7] *See, e.g.,* Loss, Merriam-Webster, https://www.merriamwebster.com/dictionary/loss; Loss, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/loss?q=Loss; Loss, Macmillan Dictionary, https://www.macmillandictionary.com/us/dictionary/american/loss.

[8] Cinemark is also entitled to coverage because the Governmental Orders, issued as a means of controlling the physical damage and dangerous conditions created by the actual presence of COVID-19, deprived Cinemark of the full use of its property resulting in physical loss or damage. Additionally, the Contamination Exclusion does not apply to losses caused by the Governmental Orders because, even if it applied to Cinemark's losses stemming from physical harm caused by COVID-19 to Cinemark's property (it does not), the exclusion would not conclusively bar coverage for loss associated with other causes such as governmental orders which are issued regardless of whether there is COVID-19 at an insured site. *Henderson Road Restaurant Systems, Inc. v. Zurich American Ins. Co.*, No.

### C. The Policy Explicitly Acknowledges that Communicable Disease May Cause Loss or Damage.

In addition, the Policy language used by FM in the Policy at issue here expressly acknowledges that "loss or damage" may be caused by communicable disease. For that reason, the Policy's Communicable Disease Response provision expressly excludes "loss or damage" caused by "communicable disease" when that "loss or damage" results from a terrorist event. The Policy provides (emphasis added):

> As respects COMMUNICABLE DISEASE RESPONSE, the following additional exclusion applies:
>
> This Policy excludes **<u>loss or damage</u>** directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss: 1) **terrorism**.

(Ex. A at 34.) Similarly, the Interruption by Communicable Disease coverage expressly recognizes **communicable disease** causes "loss or damage" to property, by specifically and clearly excepting from its coverage for **communicable disease** "loss or damage directly or indirectly caused by . . . **terrorism**." (*Id.* at 61.) The plain meaning of this exclusion clearly evidences FM's intent and expectation that the presence of a communicable disease can cause physical loss or damage. FM's argument now, that COVID-19 does not cause loss or damage, renders the terrorism exclusion superfluous and meaningless. *Nassar*, 508 S.W.3d at 258 (court must "examine the entire agreement and seek to harmonize and give effect to all provisions so that none will be meaningless.").

### D. FM Has Admitted That Loss of Functionality Is Sufficient.

Loss of functionality is a reasonable interpretation of "physical loss." Indeed, FM has itself argued that loss of functionality constitutes physical loss or damage, when doing served

---

1:20-CV-1239, 2021 WL 168422, at *14 (N.D. Ohio Jan. 19, 2021) (exclusion of loss due to "microorganisms" "does not clearly exclude loss of property caused by a government closure.").

FM's strategic purpose. In another case, FM was in Cinemark's position: it sought coverage for loss of use of property caused by the physical presence of a foreign material that rendered the property unfit for use. In advocating Cinemark's position here, FM stated (emphasis added):

> **It is undisputed that the mold infestation destroyed the aseptic environment and rendered Room 152 unfit for its intended use** – manufacturing injectable pharmaceutical products. **Numerous courts have concluded that loss of functionality or reliability under similar circumstances constitutes physical loss or damage.** *See, e.g., Western Fire Insurance Co. v. First Presbyterian Church*, 437 P.2d 52 (Colo. 1968) (church building sustained physical loss or damage when it was rendered uninhabitable and dangerous due to gasoline under the building); [*Gregory Packaging, Inc. v. Travelers Property and Casualty Company of America*, Civ. No. 2:12-cv-04418 2014 U.S. Dist. LEXIS 165232**,** 2014 WL 6675934 (D. N.J. 2014) (unsafe levels of ammonia in the air inflicted "direct physical loss of or damage to" the juice packing facility "because the ammonia physically rendered the facility unusable for a period of time."); *Port Authority of N.Y. and N.J. v. Affiliated FM Ins. Co*., 311 F.3d 226, 236 (3d Cir. 2002) (asbestos fibers); *Essex v. BloomSouth Flooring Corp*., 562 F.3d 399, 406 (1st Cir. 2009) (unpleasant odor in home); *TRAVCO Ins. Co. v. Ward*, 715 F. Supp. 2d 699, 709 (E.D. Va. 2010), *aff'd*, 504 F. App'x. 251 (4th Cir. 2013) ("toxic gases" released by defective drywall). . . . The facility was damaged by stringent requirements of OSO's customers regarding production to the same extent it was damaged from the mold infestation itself as the facility was unusable as the result of a covered loss.

(Compl. ¶ 98; Ex. L at 233–34.) FM's argument precludes it from arguing that the same argument, when made by Cinemark, is unreasonable.

### E. Cases In Which The Plaintiff Did Not Even Allege The Physical Presence Of COVID-19 On Its Property Have No Application Here.

FM also misdirects the Court by relying on a series of cases finding no coverage for losses caused primarily by governmental closure orders, contending this case is just like the others. (Mot. at 15–16.) **FM could not be any more wrong**—this case, unlike the others, is based on **different policy wording** (most contain explicit and broad virus exclusions); **different facts** (most do not allege physical damage caused by the presence of COVID-19/SARS-CoV-2); and **an explicit grant of coverage making communicable disease a covered cause of loss**. (Ans.

¶ 126.)  In fact, **none** of the cases FM cites address the issue at bar here: whether, an explicitly

alleged loss and damage process based on the actual and demonstrable presence of a deadly

communicable disease plausibly satisfies the phrase "physical loss or damage" as used in an

insurance policy that uniquely and explicitly includes "Property Damage" and "Business

Interruption" caused by "communicable disease" as a covered cause of loss.  Under settled Texas

and Fifth Circuit law, the answer can only be "yes."  *RSUI Indem. Co.*, 466 S.W.3d at 118 ("No

one phrase, sentence, or section [of a contract] should be isolated from its setting and considered

apart from the other provisions.").

First, many of the cases cited by FM involve policies that expressly and broadly excluded

virus-related loss or damage, thus forcing the plaintiffs to plead that COVID-19 was not present

on their property in a futile effort to avoid the exclusions, arguing instead that government orders

caused their losses.  Other Courts have recognized the distinction between cases where the

plaintiff seeks coverage based only on government orders and those, like this one, where

COVID-19 was physically present on and actually harmed the policyholder's property.  *Southern*

*Dental Birmingham LLC v. Cincinnati Ins. Co.*, No. 2:20-CV-681-AMM, 2021 WL 1217327, at

*5–6 (N.D. Ala. Mar. 19, 2021) (denying motion to dismiss and distinguishing from cases where

plaintiff did not allege physical presence of COVID-19).  Cinemark's Policy is the inverse of the

"virus exclusion" policies: it contains Communicable Disease Coverage and no virus exclusion,

and, as such, Cinemark is entitled to coverage on the basis of the harm COVID-19 caused to its

property.

Nevertheless, FM relies on this Court's recent decision in *Selery Fulfillment, Inc. v.*

*Colony Insurance Co.*, to support its contention that COVID-19 does not cause physical loss or

damage.  (Mot. 15–16.)  However, *Selery* is inapposite because it only deals with allegations that

government orders caused physical loss or damage. 2021 WL 963742, at *6 ("Selery here

contends that *government orders* prevented it from fully taking advantage of its property."

(emphasis in original).) In contrast, Cinemark alleges that it suffered physical loss or damage as

a result of the *presence of COVID-19* on its property. This is a significant difference because the

viral particles caused a tangible alteration to Cinemark's property and because the

Communicable Disease Coverages expressly cover diseases like COVID-19. Indeed, *Selery*

distinguishes cases holding the presence of COVID-19 on the insured property constituted

physical loss or damage on the ground that Selery did not make similar allegations. *Id.* at *7.

This Court declined to rule whether COVID-19 itself causes physical loss or damage. *Id.* at *7

n.3. The Court stated that Selery's claim failed because it did not allege that "the physical

conditions . . . actually entered the insured's property." *Id.* at *6. The Court ultimately

concluded "Government measures, not any tangible damage, caused a suspension of Selery's

business operations." *Id.* at *7. But Cinemark *does* allege COVID-19 entered its property,

rather than merely relying on the government orders. Beyond that, Cinemark adequately alleges

COVID-19 caused tangible damage to its property. Cinemark intends to put forth evidence at

summary judgment or trial, including expert testimony, to support this allegation. It would be

premature to rule at this stage, without the benefit of expert opinion, that COVID-19 does not

and, even worse, cannot ever, cause physical loss or damage.[9]

    FM's other cases similarly do not involve allegations of the presence of COVID-19 on

---

[9] In *Selery*, the Court also stated that "physical loss or damage" requires structural alteration. Cinemark is aware of no Texas appellate or Fifth Circuit precedent that requires structural alteration to trigger first-party property coverage and, thus, respectfully disagrees with this holding and requests either that the Court reconsider, or hold that, unlike Selery's policy, Cinemark's Policy does not require it. In fact, FM admits that Cinemark's Policy does not use the word "structural." (Ans. ¶ 29.) Rather, the Policy plainly includes coverage of things that cannot be structurally altered, including "physical loss or damage to electronic data, programs, or software" (Ex. A at 28), physical loss or damage resulting from an interruption of services (*Id.* at 30), and "physical loss or damage to accounts receivable records" (*Id.* at 31). To hold otherwise would effectively negate this coverage.

property.[10]  The *Terry Black's* Court's conclusion that an allegation that the virus was physically present would be insufficient is dicta because the plaintiff made no such allegation.  2021 WL 972878, at *8.  Thus, the Court made this statement in the abstract, without the benefit of any explanation as to how COVID-19 causes physical loss or damage.  The Court noted that "Plaintiffs have not pled *any facts* showing that the coronavirus caused physical loss, harm, alteration, or structural degradation to their property."  *Id.* at *8.  In contrast, Cinemark has alleged in detail the manner by which COVID-19 causes physical loss or damage.[11]

### F.  Other Decisions Enforcing Coverage for COVID-19 Losses Are Evidence That Cinemark's Interpretation Is Reasonable.

FM claims that a "majority" of cases have gone its way, which it says makes them right.  (Mot. at 1.)  It cites no law, however, for a "scorecarding" doctrine—there is none and in fact, the law is very different.  When courts split in interpreting the same policy language, it is

---

[10] *Terry Black's Barbecue, LLC v. State Auto. Mut. Ins. Co.*, No. 1:20-CV-665-RP, 2021 WL 972878, at *8 (W.D. Tex. Jan. 21, 2021) ("Plaintiffs do not allege that the virus that causes COVID-19 was ever present at either of their restaurants."); *Diesel Barbershop, LLC v. State Farm Lloyds*, 479 F. Supp. 3d 353, 359 (W.D. Tex. 2020) ("Plaintiffs also argue that it is not COVID-19 within Plaintiffs' Properties that caused the loss directly, but rather that it was the Orders that caused the direct physical loss"); *Hajer v. Ohio Sec. Ins. Co.*, No. 6:20-CV-00283, 2020 WL 7211636, at *3 (E.D. Tex. Dec. 7, 2020) ("there is no pleading that the virus itself was present on and altered the property."); *Vizza Wash, LP v. Nationwide Mut. Ins. Co.*, No. 5:20-CV-00680-OLG, 2020 WL 6578417, at *7 (W.D. Tex. Oct. 26, 2020) ("Plaintiff contends that . . . there is no indication that Covid-19 was actually present at Plaintiff's properties"); *Ybarra Invs. Inc. v. Scottsdale Ins. Co.*, No. 2020-25079, 2020 WL 7416720 (333rd Dist. Ct. Harris County, Tex. Dec. 10, 2020) (Mot. Ex. C at 2) ("Plaintiff admits that it did not 'ever assert that its properties contained, or were "infected by" a virus.'").

[11] FM's reply may cite *Mohawk Gaming Enterprise, LLC v. Affiliated FM Insurance Co.*, in which the Northern District of New York granted FM's sister company's motion for judgment on the pleadings on the grounds that the presence of an infected student at a college near, but not at, the insured property did not trigger the policy's civil authority coverage.  No. 8:20-CV-701, 2021 WL 1419782, at *6 (N.D.N.Y. Apr. 15, 2021).  However, that case is distinguishable because plaintiff's complaint contained only a conclusory statement that there was physical loss or damage, but did not contain any specific allegations as to *how* COVID-19 harmed the affected property.  *See* Complaint, *Mohawk Gaming Enters., LLC v. Affiliated FM Ins. Co.*, 2020 WL 3467893, at ¶ 49 (N.D.N.Y. June 23, 2020).  In contrast, Cinemark's Complaint contains detailed allegations putting COVID-19 at Cinemark's insured locations and explaining how COVID-19 harmed both the air and surfaces of Cinemark's property.  (Compl. ¶¶ 41–95, 137–158.)  The *Mohawk Gaming* court also held plaintiff was not entitled to communicable disease coverage because COVID-19 was only present at a nearby location, but not at the insured property itself as required by the policy.  *Mohawk Gaming*, 2021 WL 1419782, at *5.  Here, as FM admits, the Communicable Disease Coverage provisions have been triggered by the actual presence of COVID-19 at Cinemark's property.  That admission alone should suffice to defeat FM's Rule 12(c) motion.  (Ans. ¶ 126.)

evidence that the policy has multiple reasonable interpretations and is therefore ambiguous. *RSUI Indem. Co.*, 466 S.W.3d at 118 (other courts' interpretations of identical policy language are persuasive); *Murray*, 509 S.E.2d at 9 n.5 (jurisdiction split is evidence of ambiguity because "one cannot expect a mere layman to understand the meaning of a clause respecting the meaning of which fine judicial minds are at variance."). The fact that a multitude of other courts throughout the country have interpreted "physical loss or damage" to provide coverage when COVID-19 is physical present and harms the insured property is *prima facie* proof that it is a reasonable interpretation. *See, e.g.*, *Studio 417, Inc. v. Cincinnati Ins. Co.*, 478 F. Supp. 3d 794, 800 (W.D. Mo. 2020) (denying motion to dismiss because "COVID-19 allegedly attached to and deprived Plaintiffs of their property, making it 'unsafe and unusable, resulting in direct physical loss to the premises and property.'").[12]

## V. FM CANNOT ESTABLISH THAT ANY EXCLUSIONS APPLY.

FM argues that the Contamination Exclusion and the Loss of Use Exclusion bar coverage. (Mot. at 19, 23.) FM has failed to carry its burden to show either exclusion applies. *Mid-Continent Cas. Co.*, 614 F.3d at 114.

### A. The Contamination Exclusion Does Not Apply.

The Policy includes a Contamination Exclusion, which states:

This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:

> 1) **contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property

---

[12] *See also Goodwill Indus. of Orange Cty. California v. Philadelphia Indem. Ins. Co.*, No. 30-2020-01169032-CU-IC-CXC, 2021 WL 476268, at *2–3 (Cal. Super. Ct. Jan. 28, 2021) (denying insurer's motion to dismiss on basis of allegations that COVID-19 was physically present at insured property); *Southern Dental Birmingham*, 2021 WL 1217327, at *6 (same); *JGB Vegas Retail Lessee, LLC v. Starr Surplus Lines Ins. Co.*, No. A-20-816628-B, 2020 WL 7190023, at *2–3 (Nev. Dist. Ct. Nov. 30, 2020) (same); *Dino Palmieri Salons, Inc. v. State Auto. Mut. Ins. Co.*, No. CV-20-932117, 2020 WL 7258114, at *6 (Ohio Ct. Com. Pl. Nov. 17, 2020) (same). This ambiguity must be construed in Cinemark's favor. *Mid-Continent Cas. Co.*, 614 F.3d at 114 (5th Cir. 2010) (ambiguities must be resolved in policyholder's favor).

> safe or suitable for use or occupancy.  If **contamination** due only
> to the actual not suspected presence of **contaminant(s)** directly
> results from other physical damage not excluded by this Policy, the
> only physical damage caused by such **contamination** may be
> insured.

(Ex. A at 25 (bold in original).)  The Policy defines "contamination" as "any condition of

property due to the actual or suspected presence of any foreign substance, impurity, pollutant,

hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease

causing or illness causing agent, fungus, mold or mildew." (*Id.* at 81.)  Notably, the definition

does not include "communicable disease."  FM contends that the exclusion bars coverage for all

losses resulting from COVID-19.  However, FM cannot meet its burden for several reasons.

### 1. FM's Interpretation of the Contamination Exclusion Conflicts With the Communicable Disease Coverages.

The Policy contains two unique grants of coverage for communicable disease, both of

which are trigged by the "actual not suspected presence of **communicable disease**" at an insured

location.  (Ex. A at 33, 68 (bold in original).)  Together, the Communicable Disease Coverages

cover the "reasonable and necessary costs incurred by the Insured . . . for the 1) cleanup, removal

and disposal of the actual not suspected presence of **communicable diseases from insured

property**" and "the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured

during the PERIOD OF LIABILITY at such **location** with the actual not suspected presence of

**communicable disease**." (*Id.*)  "Communicable disease" is defined as a "disease which is . . .

transmissible from human to human by direct or indirect contact with an affected individual or

the individual's discharges." (*Id.* at 81.)

FM admits that COVID-19 is a communicable disease within the meaning of the Policy.

(Ans. at ¶ 126.) [13] FM cannot expressly grant coverage for losses caused by a communicable disease, but then also seek to exclude losses caused by a virus that causes the communicable disease. Common sense dictates that any reasonable reading of the Policy requires that the coverage extend to the causative agent of the covered communicable disease, here, in the case of COVID-19 (disease), SARS-CoV-2 (the causative virus). Indeed, any other reading would negate the Communicable Disease Response coverage, which is predicated on "actual presence" and the "cleanup, removal and disposal" of some tangible thing—the causative virus. (Ex. A at 33.) Thus, whatever "virus" may mean in the context of the contamination exclusion, it cannot include viruses or diseases resulting therefrom that are "transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges."

FM contends that the Communicable Disease Coverages are a "limited exception" to the Contamination Exclusion. But the Policy says no such thing. If FM intended for the Communicable Disease Coverages to be exceptions to the Contamination Exclusion, it could have easily included an express exception in the Contamination Exclusion, just as it did for radioactive contamination. (Ex. A at 25 ("This [Contamination Exclusion] does not apply to radioactive contamination").) [14] But it did not do so for "communicable disease," and the Court should reject FM's invitation to have the Court to add that language now. (Ex. A at 25, 33, 68.);

---

[13] Despite this admission, FM asks the Court to dismiss Cinemark's claim for Communicable Disease Coverage because it claims that Cinemark failed to submit information regarding the presence of a communicable disease on its property. (Mot. at 24.) This is blatantly untrue. The Complaint details Cinemark's numerous efforts to provide this information to FM, and FM's repeated refusal to respond to Cinemark's letters, let alone properly investigate the information that Cinemark provided. (Compl. at ¶¶ 228–242; Ex. H.) At most, it is a question of fact inappropriate for resolution on a motion for judgment on the pleadings whether Cinemark provided adequate information to FM regarding its claim.

[14] The policy also contains numerous other express exceptions to exclusions. (*See, e.g.*, Ex. A at 21 (unfueled watercraft and aircraft manufactured by policyholder excepted from exclusion for damage to watercraft and aircraft), 21–22 (Decontamination Costs and Law and Ordinance coverages excepted from "loss from enforcement of any law or ordinance" exclusion), 24 (Service Interruption and Off Premises Data Services coverages excepted from lack of services exclusion).)

*Solvent Underwriters*, 282 S.W.3d at 670 (a court "cannot rewrite the policy or revise its provisions to avert what the parties perceive to be unfavorable consequences that might flow from the court's interpretation and construction.").

FM's expansive approach to the contamination exclusion would eviscerate the communicable disease coverage, violating the principle that, in a contract, "effect [must be given] to all of the words and provisions so that none is rendered meaningless" and "No one phrase, sentence or section [of a contract] should be isolated from its setting and considered apart from the other provisions." *RSUI Indem. Co.*, 466 S.W.3d at 118 (second set of brackets in original). Those terms must be read harmoniously—without conflict or redundancy—with any tension resolved in Cinemark's favor. *Nassar*, 508 S.W.3d at 258 (ambiguities must be resolved in policyholder's favor).

And finding the contamination exclusion inapplicable to "communicable disease" as defined in the Policy in no way renders provisions of that exclusion superfluous. Indeed, one reasonable way of interpreting the exclusion in a manner consistent with broad coverage for "communicable disease," as alleged by Cinemark, would have the exclusion apply to contamination caused by a virus that does not meet the Policy's definition of "communicable disease." That is, the exclusion would apply only to virus-related contamination that is ***not*** "transmissible from human-to-human." At a minimum, FM cannot conclusively demonstrate that Cinemark's construction is unreasonable.

### 2. The Contamination Exclusion Only Applies to "Costs" And Does Not Apply to Cinemark's Losses.

The Contamination Exclusion excludes "contamination, and any *cost* due to contamination including the inability to use or occupy property or any *cost* of making property safe or inhabitable for use or occupancy." (Ex. A at 25 (emphasis added).) Thus, by its terms,

the exclusion only applies to "costs," not losses. Most of Cinemark's claims are for Time Element *loss* and Extra Expense *loss*, which are not *costs* and therefore not excluded. (Compl. ¶¶ 166–176.) *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991) (Exclusions are "strictly construed against the insurer and in favor of the insured.") Courts have held that when an exclusion uses the term "cost," it applies only to the policyholder's costs, not to all damages the policyholder sustains. *American Motorists Ins. Co. v. Trane Co.*, 718 F.2d 842, 845 (7th Cir. 1983) (exclusion "only applied to costs associated with discovering and remedying faulty products . . . [but not] alleged other damages.").

The Policy distinguishes between "losses" and "costs," and certain sections of the Policy deal with only one of the two. This is illustrated by the Policy's division of its Communicable Disease Coverages into two sections: one covering "the reasonable and necessary **costs** incurred by the Insured" and the other covering the "Actual **Loss** Sustained . . . by the Insured." (Ex. A. at 33, 68 (emphasis added).) If "loss" and "cost" were synonymous, these two sections could be combined into a single coverage (or use the same term). Similarly, when FM wished to exclude both costs and losses, it did so expressly—the Policy excludes "***loss*** from enforcement of any law or ordinance . . . requiring the demolition of any property, including the ***cost*** in removing its debris." (*Id.* at 22 (emphasis added).)[15] But FM did not do so in the Contamination Exclusion.

The Southern District of New York recently addressed this exact issue in another case against FM, and concluded that Cinemark's interpretation is reasonable. *Thor Equities, LLC v. Factory Mutual Ins. Co.*, No. 20 Civ. 3380 (AT), 2021 WL 1226983, at *4 (S.D.N.Y. Mar. 31, 2021). The Contamination Exclusion and definition of contamination in that case are identical to

---

[15] The Policy contains other examples of the distinction between "loss" and "cost." (*See, e.g.*, Ex. A at (32–33 (covering claim preparation costs), 35 (covering debris removal costs), 48 (covering time element loss).)

the exclusion and definition in this case. *Compare Thor Equities*, 2021 WL 1226983, at *3 *with*

Ex. A at 25, 81. This Court should also conclude that it is a reasonable interpretation that the

Contamination Exclusion only excludes costs, not business income and other losses. *RSUI*

*Indem. Co.*, 466 S.W.3d at 118 ("Courts usually strive for uniformity in construing insurance

provisions, especially where . . . the contract provisions at issue are identical across the

jurisdictions."). The Southern District of New York explained (at *4) that:

> [T]he Policy distinguishes between "cost" and "loss" elsewhere, but no such
> distinction is present here. . . . Moreover, the plain meaning of cost—"the amount
> paid or charged for something"—could plausibly refer to affirmative outlays, like
> paying for temporary use of other property. *Cost*, Black's Law Dictionary (11th
> ed. 2019).

An illustration shows the difference between a "loss" and a "cost" and how the

Contamination Exclusion only applies to the latter. For example, if a restaurant had to pay for

mold remediation due to a mold infestation, the contamination exclusion's reference to "cost[s]

due to contamination" would apply to exclude remediation costs. But, if a restaurant had to shut

down due to the presence of mold rendering it unusable, its lost income would not be a "cost."

Instead, it would be Time Element "loss" which the contamination exclusion does not bar. If FM

meant for the contamination exclusion to apply to Time Element loss and Extra Expense loss, it

could have easily included those terms in the exclusion. FM did not and cannot insert them now.

### 3. The Contamination Exclusion Reasonably Applies to Traditional Industrial Pollutants and Does Not Encompass Viruses Like COVID-19.

The exclusion is limited to those viruses arising in the industrial pollution context like the

other "contaminants" that are excluded, as well as viruses which do not cause a disease to spread

person-to-person. But it would not apply to a case like this one which (1) does not involve

pollution, and (2) does involve loss caused by "communicable disease"—a cause of loss

specifically covered under FM's unique Policy.

That the exclusion is limited to only industrial pollution is borne directly from the Policy wording. According to the Policy, the exclusion bars coverage for "any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew." (Ex. A at 81.) Pursuant to *noscitur a sociis*, "a word is known by the company it keeps"; this canon was created to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words," so as not to give "unintended breadth" to the provision. *Yates v. United States*, 574 U.S. 528, 543 (2015).[16] The terms which surround virus and pathogen or pathogenic organism reasonably concern pollutants that can damage property and it follows that "virus" and "pathogen or pathogenic organism" should be read to narrowly apply to a similar hazardous and or industrial pollution context, a context not reasonably including COVID-19/SARS-CoV-2 at Cinemark's movie theaters. *See Paternostro v. Choice Hotel Int'l Servs. Corp.*, No. CIV.A. 13-0662, 2014 WL 6460844, at *14 (E.D. La. Nov. 17, 2014) (bacteria not deemed pollutants as the term is "generally understood" for purposes of a pollution exclusion).

This issue has already been addressed in the context of COVID-19. As the court explained in *JGB Vegas Retail Lessee*, 2020 WL 7190023, at *3:

> Starr has not shown that it is unreasonable to interpret the Pollution and Contamination Exclusion to apply only to instances of traditional environmental and industrial pollution and contamination that is not at issue here, where [insured's] losses are alleged to be the result of a naturally occurring communicable disease. This is the case, even though the Exclusion contains the word "virus." *See e.g. Urogynecology Specialist of Fla. LLC v. Sentinel Ins. Co.*, No. 6:20-cv-1174, 2020 WL 5939172, at *4 (M.D. Fla. Sept. 24, 2020), (Denying coverage for losses stemming from COVID-19, however, does not logically align with the grouping of the virus exclusion with other pollutants such that the Policy necessarily anticipated and intended to deny coverage for these kinds of business losses.) Accordingly, the Court

---

[16] Courts have applied the canon in interpreting exclusions. *See, e.g.*, *Flagship Credit Corp. v. Indian Harbor Ins. Co.*, 481 F. App'x 907, 912 (5th Cir. 2012) (under this doctrine, exclusion for "fines, penalties or taxes" applied only to penalties paid to the government).

finds that the Pollution and Contamination Exclusion does not apply to exclude [the insured's] claims.

If FM wanted to exclude viruses in all contexts rather than just in the context of traditional pollution, it could have used the standard "loss due to Virus or Bacteria" exclusion drafted by the Insurance Services Office ("ISO"), an entity charged with drafting policy language for the insurance industry.[17] FM could have also used an express pandemic exclusion.[18] But it did not. (Compl. ¶¶ 213–15.) The cases that FM cites in support of its interpretation of the Contamination Exclusion are inapposite because they involve policies with ISO virus exclusions (or other similar express virus exclusions) rather than contamination exclusions, the exclusions expressly apply to "loss," and the policies do not contain coverage for communicable diseases.[19] These exclusions are broader than the Contamination Exclusion because they exclude losses and disease, which are expressly covered by the Communicable Disease Coverages.

### 4. FM Cannot Establish that Cinemark's Construction Is Unreasonable.

For the reasons discussed above, Cinemark's interpretation is the only reasonable interpretation. However, even if the Court were to conclude FM's interpretation is reasonable, Cinemark's interpretation is *also* reasonable. The policy is thus ambiguous and should be

---

[17] The ISO virus exclusion states: "We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." *See, e.g.*, *Hajer*, 2020 WL 7211636, at *4.

[18] Insurers knew of the possibility for pandemics, and some excluded that risk. *Choctaw Nation of Oklahoma v. Lexington Ins. Co.,* No. CV-20-42, 2021 WL 714032, at *10 (D. Okla. Jan. 27, 2021) ("[I]n 2008, Lloyd's published Pandemic: Potential Insurance Impacts, where it stated business interruption coverage needed to be carefully drafted by carriers because a pandemic is inevitable."); *Meyer Nat. Foods, LLC v. Liberty Mut. Fire Ins. Co.*, 218 F. Supp. 3d 1034, 1038 (D. Neb. 2016) (pandemic exclusion bars coverage for "The actual or suspected presence or threat of any virus, organism or like substance that is capable of inducing disease, illness, physical distress or death, whether infectious or otherwise, including but not limited to any epidemic, *pandemic*, influenza, plague, SARS, or Avian Flu." (emphasis added)).

[19] *Hajer*, 2020 WL 7211636, at *4 (standard ISO virus exclusion); *Vizza Wash*, 2020 WL 6578417, at *6 (standard ISO exclusion); *Diesel Barbershop*, 479 F. Supp. 3d at 356–57 (exclusion states "We do not insure under any coverage for any loss which would not have occurred in the absence of . . . virus, bacteria or other microorganism that induces or is capable of inducing physical distress, illness, or disease.").

construed in Cinemark's favor. *Nassar*, 508 S.W.3d at 258 (the Court "'must resolve the uncertainty by adopting the construction that most favors the insured,' and because [the Court] is construing a limitation on coverage, [the Court] must do so 'even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent.'")

As discussed above, in *Thor Equities*, the court found that an identical Contamination Exclusion was ambiguous because both parties proffered reasonable interpretations. 2021 WL 1226983, at *4. The court explained, "it . . . cannot be said that the exclusion unambiguously forecloses recovery on Thor's losses due to contamination, and thus the Court cannot conclude that 'there is no reasonable basis for a difference of opinion.'" *Id.* (quoting *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990).) The same logic should control here.

## B. The Loss of Use Exclusion Does Not Apply.

The Loss of Use Exclusion does not apply where the loss of use results from covered risks of physical loss or damage—any argument otherwise would gut the policy. Indeed, the policy covers a broad range of loss of use, including Time Element coverage. It includes leasehold interest coverage, which provides coverage for the rent payable on a property that is "partially untenantable or unusable . . . ." (Ex. A at 54.) It also covers loss of use due to civil or military authority, an obstruction of ingress or egress, and the interruption of certain services or communicable diseases. (*Id.* at 61–62, 65, 68.) But where, as here, there is a direct physical loss, it is not barred by the Loss of Use Exclusion. To interpret the exclusion otherwise would render coverage illusory. *ATOFINA Petrochemicals, Inc. v. Continental Cas. Co.*, 185 S.W.3d 440, 444 (Tex. 2005) (rejecting insurer's interpretation that would render coverage illusory). This is not to suggest the exclusion has no teeth—it prevents coverage where the loss of use does not result from any physical loss or damage. As the Court stated in *Henderson* in rejecting the insurer's assertion on a motion for summary judgment that the loss of use exclusion precluded

coverage for policyholder's COVID-19 losses, "[t]he Business Income Coverage provides that [the insurer] will pay for 'loss of business income' sustained 'due to the necessary suspension of operations caused by direct physical loss of or damage to property.' Here, the Loss of Use exclusion *would* vitiate the Loss of Business Income coverage." 2021 WL 168422, at *16.

Because the Policy must be read in its entirety and disputed terms interpreted in a manner calculated to give the agreement its intended effect, *Nassar*, 508 S.W.3d at 258, the 'Loss of Use' exclusion does not exclude coverage under the Policy's Business Income coverage.

## VI. THE COMMUNICABLE DISEASE SUBLIMIT DOES NOT APPLY.

FM admits that Cinemark is entitled to coverage under the Communicable Disease Coverages sections. (Mot. at 26; Ans. at ¶ 126; Ex. 1, Apr. 12, 2021 Transcript at 5:9–21.)[20] However, FM incorrectly contends that a $1 million sublimit controls this case. (Mot. at 22.) While the sublimit may apply to the "communicable disease" coverages, it certainly does not apply to any other implicated coverage. When, as here, a communicable disease causes physical loss or damage, it implicates multiple coverage provisions under the Policy and, therefore, the Policy's full $500 million policy limit.

Contrary to FM's contentions, this does not "ignore and/or render meaningless" the communicable disease sublimit. (*Id.*) Rather, that sublimit continues to apply to the unique and broad coverages afforded under the two Communicable Disease provisions. But, when the presence of communicable disease also causes physical loss or damage to insured property, as has been plausibly alleged here, and as the Policy expressly contemplates (*see* Ex. A at 34, 61

---

[20] Despite this admission, FM seeks to dismiss Cinemark's claim for Communicable Disease Coverage, claiming that Cinemark failed to submit information regarding the presence of a communicable disease on its property. (Mot. at 24.) This is untrue. The Complaint details Cinemark's numerous efforts to provide this information to FM, and FM's repeated refusal to respond to Cinemark's letters, let alone properly investigate the information that Cinemark provided. (Compl. at ¶¶ 228–242; Ex. H.) At most, it is a question of fact inappropriate for resolution on a motion for judgment on the pleadings whether Cinemark provided adequate information to FM regarding its claim.

(terrorism exclusion to Communicable Disease Coverages)), the terms of coverage under other parts of the Policy are implicated. It is a reasonable reading that the sublimit only applies when a communicable disease does not implicate other coverages because it does not cause physical loss or damage. Whether that is the case here, however, is a disputed question of fact.

For instance, if a communicable disease was present and required removal and disposal, but—unlike COVID-19—did not cause physical loss or damage, then Cinemark would only receive up to $1 million of coverage. But that is not the case here because, unlike some diseases, COVID-19 causes demonstrable, tangible physical changes to property in the manners discussed above, and cannot be removed just by cleaning. Critically, nowhere does the Policy say or even suggest that the only coverage available for loss or damage caused by communicable disease is limited to the two Communicable Disease coverage provisions. To the contrary, the Policy clearly allows for coverage under other parts of the Policy, such as the Policy's Time Element coverages, when Cinemark sustains "physical loss or damage of the type insured." (Ex. A at 48.)

Here, however, for the reasons explained above, the Policy's Time Element coverages are triggered (independent from the Policy's sublimited Communicable Disease Coverages) because: COVID-19/SARS-CoV-2 (1) caused physical loss of Cinemark's property, and (2) caused damage to Cinemark's property, both of which constitute "loss or damage of the type insured." Therefore, Cinemark's interpretation is at least a reasonable one, and the Policy should be construed in favor of coverage. *Nassar*, 508 S.W.3d at 258 (if there is more than one reasonable interpretation, the policy is ambiguous and must be construed in the policyholder's favor).

## VII. FM ACTED IN BAD FAITH.

FM first argues that Cinemark's common law and statutory bad faith claims should be dismissed because there is no coverage under the Policy, but there is coverage for the reasons discussed above, at least one of which FM actually concedes. FM next argues that it acted

reasonably. But FM prejudged Cinemark's claim and denied it without investigation based on company-wide Talking Points issued long before Cinemark's claim was even presented to FM. (Compl. ¶¶ 244–262.) *State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 44 (Tex. 1998) (insurer acted in bad faith by failing to completely investigate claim). Therefore, even if FM is correct that only the Policy's $1 million Communicable Disease coverages are implicated (it is not), FM failed to conduct any reasonable investigation under the coverages it concedes apply here and has utterly breached its contractual obligations by failing to pay anything under even those coverages. (Mot. at 26; Ans. at ¶ 126; Ex. 1, Apr. 12, 2021 Transcript at 5:9–21.) This is quintessential bad faith. *Aetna Cas. & Sur. Co. v. Garza*, 906 S.W.2d 543, 550 (Tex. Ct. App. 1995) (insurer acted in bad faith because "there is no evidence . . . that [insurer] was investigating or gathering facts to circumstantially prove anything.")[21]

## VIII. CONCLUSION

For the reasons set forth above, the Court should deny FM's Motion for Judgment on the Pleadings.

DATED: April 20, 2021

/s/ *Melissa R. Smith*
Michael S. Levine*
District of Columbia Bar No. 449272
mlevine@huntonAK.com
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Ave. SW, Suite 500
Washington, DC 20037-1701
Telephone:    (202) 955-1857
Facsimile:    (202) 778-2201

---

[21] FM also asks the Court to dismiss Cinemark's claim for declaratory judgment because it is "redundant" of the breach of contract claim. But a plaintiff may bring claims for both breach of contract and declaratory judgment of its rights under the same contract. *Ins. Distribution Consulting, LLC v. Freedom Equity Grp., LLC*, No. 3:20-CV-00096 2020 WL 5803249, at *4 (S.D. Tex. Sept. 4, 2020) ("There is thus no rule nor statute . . . that prevents a plaintiff from seeking both monetary relief for breach of contract and a declaratory judgment as to the parties' rights and obligations under the agreement.")

Melissa R. Smith
Texas Bar No. 24001351
melissa@gillamsmithlaw.com
GILLAM & SMITH LLP
303 S. Washington Avenue
Marshall, TX  75670
Telephone:     (903) 934-8450
Facsimile:     (903) 934-9257

Rachel E. Hudgins*
Georgia Bar No. 123342
rhudgins@huntonAK.com
HUNTON ANDREWS KURTH LLP
600 Peachtree Street, N.E., Suite 4100
Atlanta, GA  30308-2216
Telephone:     (404) 888-4000
Facsimile:     (404) 888-4190

Joseph T. Niczky*
New York Bar No. 5492103
jniczky@huntonAK.com
HUNTON ANDREWS KURTH LLP
200 Park Avenue, 52nd Floor
New York, NY 10166
Telephone:     (212) 309-1000
Facsimile:     (212) 309-1100

Casey L. Coffey*
Florida Bar No. 1025941
ccoffey@huntonAK.com
HUNTON ANDREWS KURTH LLP
333 SE 2nd Avenue, Suite 2400
Miami, FL  33131
Telephone:     (305) 810-2500
Facsimile:     (305) 810-2460

**Attorneys for Plaintiffs**

*Admitted *Pro hac vice*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of the foregoing document via the Court's CM/ECF system per Local Rule CV-5(a)(3) this April 20, 2021.

*/s/ Melissa R. Smith*

074158.0000068 EMF_US 84621865v1